945 A.2d 707 (2008)
400 N.J. Super. 1
D.G., Guardian Ad Litem for J.G., a Minor, Plaintiff-Appellant
v.
NORTH PLAINFIELD BOARD OF EDUCATION, Richard Greco, Director of Pupil Services, Jane Delaney, Supervisor, Special Education, and Marilyn Birnbaum, Superintendent, Defendants-Respondents.
No. A-3988-05T5.
Superior Court of New Jersey, Appellate Division.
Argued December 5, 2007.
Decided April 9, 2008.
*710 Francine A. Gargano, argued the cause for appellant.
John H. Schmidt, Jr., Westfield, argued the cause for respondent (Lindabury, McCormick, Estabrook & Cooper, attorneys; Mr. Schmidt and Lisa Gingelskie, on the brief).
Before Judges PARKER, R.B. COLEMAN and LYONS.
The opinion of the court was delivered by
PARKER, J.A.D.
Plaintiff D.G., guardian ad litem for her son J.G., appeals from an order entered on March 17, 2006 denying her motion for a new trial or judgment notwithstanding the verdict (JNOV). After careful consideration of plaintiff's arguments, we affirm.
J.G. has suffered from cerebral palsy since infancy. In June 2000, at the end of his fifth grade year, J.G.'s mother, D.G., filed a due process petition with the Department of Education (DOE), claiming that the North Plainfield Board of Education (Board) failed to comply with J.G.'s individual education plan (IEP). Subsequent to filing the administrative action, plaintiff filed a complaint in the Law Division against the Board and several individual employees, claiming that J.G. was a victim of discrimination in violation of the Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -42, the Americans With Disabilities Act (ADA), 42 U.S.C.A. §§ 12101 to 12213, and the Federal Civil Rights Act, 42 U.S.C.A. §§ 1983 and 1985.
When plaintiff filed an interlocutory appeal from the administrative action in the Law Division, the then-presiding judge of the Civil Part in Somerset County consolidated the administrative and Law Division actions "for administrative purposes pending further order of the [c]ourt." The consolidation order stayed both actions for ninety days pending the parties' pursuing voluntary mediation. The mediation was unsuccessful and the cases were subsequently consolidated "for all purposes including discovery and trial."
The Law Division matter was tried over twenty days in November and December 2005. At the close of plaintiff's case, the trial judge dismissed one count of the complaint, which alleged intentional infliction of emotional distress. The jury decided in favor of defendants on all remaining counts.
The facts relevant to this appeal are as follows. J.G. was classified as orthopedically impaired and enrolled in Stony Brook School from kindergarten through fifth grade. The boy's grandmother, R.G., served as his in-classroom aide for the first five years of his education. A number of accommodations were made for J.G., who was wheelchair-bound, to attend classes in the two-story building. R.G. was given a key to the school elevator, a bathroom on the second floor was made handicap accessible, as was a bathroom in the nurse's office. Computers, special chairs, mats and hand-held recorders were purchased for the boy's use, and he was provided with a second set of school books to keep at home. J.G.'s teachers gave him modified assignments and extended test times. His class sizes were limited and he received preferential seating and stretch breaks.
Through the end of the third grade, J.G. received physical therapy, occupational therapy and speech therapy, plus *711 adaptive physical education. Prior to fourth grade, however, plaintiff demanded that J.G. be provided with "conductive education," an all-encompassing therapy program, in lieu of his usual therapies, and threatened to file a due process petition if the Board did not accede to her request. The Board hired Erica Nagy, the conductive educator specified by plaintiff, and gave her permission to work with J.G. in his classrooms, the hallways, the gym and a small therapy room at the Stony Brook School. The Board also paid for and transported J.G. to a special summer camp run by Nagy beginning the summer prior to fifth grade and every year thereafter.
In the Spring of 1999, prior to J.G.'s fifth grade year at Stony Brook, plaintiff requested that the boy not be required to take his tests in the hallway, that he receive transportation to participate in band and chorus, that he be admitted into Stony Brook's ASK program, and that he be provided with a male in-classroom aide. The principal at Stony Brook, Antoinette Plewa, allowed J.G. to participate in the ASK program, an after-school homework program designed for underachieving children, even though he did not qualify because his grades were very good. Plaintiff further requested that the male aide be permitted to attend J.G.'s conductive education summer camp so that he would be appropriately trained when school began. The Board agreed to the summer training.
Ricardo Beckford was hired as J.G.'s aide. Beckford had some experience with cerebral palsy children and had worked as an aide in the district previously. He had vacation plans over the summer, however, and was unable to attend the camp. At the beginning of the next school year, the Board authorized Nagy to exceed her contract hours to train Beckford as an additional accommodation to plaintiff.
Initially, J.G. and Beckford got along well. After a period of time, however, J.G. complained to his mother that Beckford fell asleep in class, failed to get J.G. to the bathroom in time and failed to properly pack his school bag with his homework. J.G. also claimed that Beckford turned off the power wheelchair and yelled at him to the point where J.G. was afraid. Plaintiff contacted Principal Plewa, who spoke with Beckford and J.G.'s teachers regarding the boy's allegations.
Beckford acknowledged that he had a night job but denied falling asleep in class. He denied turning off the wheelchair but noted that he was sometimes forced to intervene because J.G. traveled too fast or crashed the chair. Beckford also acknowledged that J.G. wet himself about twice a week but explained that this occurred when the boy was socializing with friends and waited too long to use the bathroom. J.G.'s teachers denied seeing Beckford sleeping or signs of urine indicating that the boy had wet himself. After completing her investigation, Plewa concluded that most of J.G.'s allegations were unsubstantiated. She did, however, direct Beckford not to turn off the wheelchair unless the boy was in danger.
In November 1999, plaintiff and J.G. attended a meeting regarding J.G.'s allegations about Beckford. Plewa, Richard Greco, Director of Pupil Services, several of J.G.'s teachers and Jane Delaney, the Special Education Supervisor were at the meeting. When the meeting became contentious and J.G. began to cry, plaintiff wheeled him out of the room, ending the meeting. The relationship between J.G. and Beckford continued to deteriorate after the meeting and plaintiff filed a complaint with the Division of Youth and Family Services (DYFS), alleging that Beckford physically abused the child. After investigating the incident, DYFS found *712 that the allegation of physical abuse was not substantiated. Notwithstanding the DYFS finding, the Board decided to hire a new aide for J.G. and hired Sharon Lonergran to work with the boy for the remainder of the school year.
During the same school year, J.G. complained to plaintiff that he was being put in the hallway for every test by all of his teachers in violation of his IEP, which provided that Stony Brook would enable J.G. to take eighty percent of his tests on the computer. Ron Fisher, the Board's Director of Technology and Information Services, testified that he purchased a special laptop for J.G.'s exclusive use, but was unable to obtain the software that would permit J.G. to type answers into previously computer-scanned tests. Moreover, J.G.'s teachers adamantly denied that they put the boy in the hallway for his tests, although his math and computer teacher acknowledged having a policy of giving all students makeup tests in the hallway because there were no extra classrooms in the school.
Plaintiff continued to make numerous complaints throughout the school year, claiming that Greco responded with irritation, telling her that the boy should have been "put away" in a cerebral palsy school years ago. Greco denied ever making such a statement. Plaintiff removed J.G. from school on June 14, 2000, when she filed the due process petition with the DOE. Although the boy missed a total of about eighty school days during the fifth grade, Plewa ensured that his final marks were based upon the work he had completed and permitted him to graduate to the sixth grade.
In her due process petition, plaintiff complained that there was no appropriate sixth grade placement for J.G. The only sixth grade program in North Plainfield for the 1999-2000 term was in the two-story Somerset School, which was more than 100 years old, overcrowded, offered only a single bathroom on each floor and contained just one stairwell-mounted fold-out lift to enable a disabled student to get from the first to the second floor. In her due process petition, plaintiff sought to have the Board "reconfigure the school district" so that the seventh graders could attend the Somerset School while J.G. and his sixth grade classmates could use the more accessible middle school. Greco, the Director of Pupil Services, stated that plaintiff's proposal was not feasible because it would have affected over 600 children. He did, however, offer to pay J.G.'s tuition to an out-of-district school of plaintiff's choice. J.G. applied to one out-of-district school, but was not accepted.
On December 20, 1999, plaintiff toured the Somerset School with Principal Judy Grady. After the tour, plaintiff requested that the lift be replaced with one large enough to accommodate J.G.'s power wheelchair and that the second floor girls' bathroom be redesignated as a boys' bathroom and made handicap accessible.
After plaintiff filed her due process petition in June 2000, the Board's counsel had repeated discussions with plaintiff's counsel regarding J.G.'s sixth grade placement. Plaintiff continued to maintain, through her counsel, that the Somerset School was not an appropriate placement for J.G. because it was physically inaccessible. During the summer of 2000, however, plaintiff was unavailable for discussions to resolve the problems because she took J.G. on a month-long vacation.
A meeting was scheduled for September 18, 2000, the day J.G. was expected to return to school. To prepare for the sixth grade year, Greco hired Constance Fenner to provide twenty hours of home instruction to J.G. Acceding to plaintiff's request, Greco also hired Linda Ciufo, a family *713 friend who was residing with plaintiff and J.G., to serve as J.G.'s in-classroom aide. In the event plaintiff elected to have J.G. attend the Somerset School, Greco also hired Sherry Muenz to serve as an in-class support teacher and renewed Nagy's contract for continued conductive education.
On Friday, September 15, 2000, three days before J.G. was to begin the sixth grade, the Board's counsel and plaintiff's counsel had a conference call with the Administrative Law Judge (ALJ) hearing plaintiff's due process petition. At the direction of the ALJ, the Board's counsel sent a letter to plaintiff's counsel setting forth the available options for the sixth grade year. The letter read as follows:
Pursuant to our discussions, we have tentatively scheduled a continuation of the IEP meeting for Monday, September 18, 2000 at 10:00 a.m. As you are aware, your client's unavailability in Poland has made it difficult to resolve the outstanding issues regarding [J.G.'s] placement for the school year.
. . . .
With respect to school on Monday, the District has determined that Somerset School is not the least restrictive environment for [J.G.] due to the inadequacy and inaccessibility of the facility. The District has arranged for home instruction to be provided for [J.G.] for ten hours per week. The home instructor, Constance Fenner, has [J.G.'s] academic materials in her possession and will be contacting your client on Saturday to make arrangements for the delivery of same and the scheduling of his home instruction. Should [J.G.] wish to participate in extra curricular activities during home instruction, please be advised that the District will provide transportation.
The last agreed-upon IEP provides for placement at the [Stonybrook] School. [J.G.] may attend school at Stonybrook. There is a special education class including fifth and sixth graders which is appropriate for [J.G.] pending the resolution of the outstanding issues.
The District has employed Linda Ciufo, pursuant to your client's request, to serve as [J.G.'s] school aide. However, Ms. Ciufo's start date will be resolved . . . [when] the outstanding issues regarding the least restrictive environment for [J.G.] are resolved.
Please contact me today regarding your intentions with respect to [J.G.] accepting home instruction or attending [Stonybrook].
Plaintiff's counsel did not raise any objections to the letter and merely stated that she would be at the meeting on September 18, 2000.
Plaintiff, however, had arranged for a large rally in support of J.G. on the morning of September 18, 2000 in front of the Somerset School. During the rally, plaintiff and J.G. were admitted to the building and plaintiff proceeded to lie down on the floor of the principal's office while shouting obscenities at various Board members who had gathered for the IEP meeting. The police had to be called to disperse the crowd and calm the situation.
No formal IEP was adopted but J.G. began attending the Somerset School for the sixth grade, using a manual wheelchair to fit into the existing lift. A schedule was prepared by which J.G. spent most of his day on the second floor, minimizing his need to use the lift. Although the boy only had access to the girls' bathroom on the second floor, J.G.'s aides tied a no admittance ribbon to the door to ensure his privacy when he was using the facility.
In October 2000, J.G. complained to plaintiff that he was being stalked and watched by Greco, the Pupil Services Director, *714 and Delaney, the Special Education Supervisor. According to plaintiff, J.G. was so hysterical she had to keep him home from school on October 20, 2000. Greco explained that he observed J.G. on two occasions because Nagy, J.G.'s conductive educator, had not submitted requested reports detailing the boy's current condition in compliance with the requirement that the district re-evaluate all classified students every three years. Greco testified that he simply observed the boy and Ciufo operating the lift on one day and that he returned the next day to sit in on two classes. Delaney observed J.G. on one occasion at Muenz's request but left the room quickly because she saw that the boy was becoming anxious.
In December 2000, J.G. underwent hip surgery requiring a two-month recovery period, during which the Board provided home tutoring services. When the boy returned to the hospital for an additional three-week period in January 2001, the Board provided for in-hospital tutoring.
On February 26, 2001, J.G. returned to school and almost immediately began complaining about Ciufothe aide plaintiff specified be hired for J.G.claiming that she was cold and cruel, yelled at him on several occasions and used obscenities. Ciufo denied the incidents and no one was able to corroborate J.G.'s claims. Thereafter, J.G. attended school only three days a week when Nagy was available and, finally, on April 5, 2001, plaintiff removed J.G. from school and he was home tutored for the remainder of the sixth grade.
In June 2001, plaintiff toured the North Plainfield Middle School in anticipation of J.G.'s seventh and eighth grade years. She was informed that the middle school and high school, which formed one large complex, would be under construction during J.G.'s entire seventh grade year. In order to limit J.G.'s need to use the lift, all of his classes were scheduled on the first floor and a first floor classroom was converted to a science room for him. Although plaintiff admitted that J.G. had good years in the seventh and eighth grades, she nonetheless complained that his computer needs were not met during those years. The evidence indicated, however, that J.G. was re-evaluated as to his technology needs in the Fall of 2001 and the Board purchased a new laptop for him with a special expanded keyboard, a printer and a variety of specialized software. The Board also paid for many hours of computer training for J.G. and for a rental computer when the new laptop crashed.
In the ninth and tenth grades,[1] J.G. often complained that the lift broke. Douglas Boydston, the contractor used by the Board to repair the lift, testified that there had been problems with the lift, but his company was called promptly by the school and the repairs were made quickly. When the lift broke down in April 2004, it could not be repaired. In July 2004, however, the Board passed an emergency measure allowing for the purchase of a new lift.
J.G. continued to complain about the bathrooms, but the North Plainfield Construction Official and the architect who prepared the plans for renovation of the high school both testified that the bathrooms were ADA and code compliant. Even plaintiff's expert testified that the handicap stalls and bathroom passageways were properly sized.
In this appeal, plaintiff argues:
POINT ONE

*715 JUDGE KUMPF ERRED BY SEVERING THE CASES
POINT TWO
THE COURT ERRED BY REFUSING TO MAKE REASONABLE ACCOMMODATIONS FOR PLAINTIFF FORCING HIM TO HAVE A CHANGE OF VENUE
POINT THREE
THE COURT ERRED BY NOT GRANTING PLAINTIFF'S MOTION IN LIMINE TO DECLARE PLAINTIFF A PREVAILING PARTY WITH REGARD TO THE ACCESS ISSUES
POINT FOUR
JUDGE BUCHSBAUM ERRED BY ALLOWING ANTHONY SCIARILLO TO TESTIFY
POINT FIVE
THE COURT ERRED BY NOT ALLOWING FRANCINE A[.] GARGANO, ESQ. TO TESTIFY
POINT SIX
JUDGE BUCHSBAUM ERRED BY ALLOWING WENDY NG [SY] TESTIFY
POINT SEVEN
THE JUDGE ERRED BY DIRECTLY DISCRIMINATING AGAINST [J.G.]
POINT EIGHT
JUDGE BUCHSBAUM ERRED BY CONSTANTLY INTERRUPTING, INTERJECTING AND OBJECTING TO THE TESTIMONY OF WITNESSES AND MAKING IMPROMPTU COMMENTS TO THE JURY
POINT NINE
THE JUDGE ERRED BY NOT ORDERING A NEW TRIAL

I
Plaintiff first contends that Judge Kumpf committed reversible error in, sua sponte, remanding the administrative portion of the previously consolidated action to the OAL on the eve of trial.
After plaintiff filed an interlocutory appeal from the administrative action in the Law Division, the parties agreed to consolidate the administrative and Law Division actions to engage in mediation.
When mediation was unsuccessful, plaintiff moved to consolidate the two actions in the Law Division for all purposes, including trial. Defendant did not object and the motion was granted on March 2, 2004.
On June 22, 2005, defendants moved before Judge Kumpf for summary judgment with respect to plaintiff's interlocutory appeal in the administrative action. On August 1, 2005, Judge Kumpf denied this motion, but sua sponte remanded the bulk of the administrative action back to the Office of Administrative Law (OAL) based upon his finding that there was no jury question presented given the lack of an administrative determination to review.
Plaintiff argues that there are numerous forums in which to litigate special education cases: the OAL, Superior Court or Federal District Court. In that statement she is correctbut each forum has jurisdiction over certain matters and may be precluded from hearing others. Each administrative agency is vested with authority to adjudicate legal rights and duties of specific parties arising under the rules and regulations promulgated by the agency. N.J.S.A. 52:14B-2(b) and (c); J.E. on Behalf of G.E. v. State Dept. of Human Servs., Div. of Devel. Disabil., 131 N.J. 552, 622 A.2d 227 (1993). Judicial review of administrative actions is vested in the Appellate Division, R. 2:2-3(a)(2), and is severely limited. In re Musick, 143 N.J. 206, 216, 670 A.2d 11 (1996) (citing Gloucester County Welfare Bd. v. N.J. Civil Serv. Comm'n, 93 N.J. 384, 390, 461 A.2d 575 (1983)). The judiciary may intervene *716 only in "rare circumstances in which an agency action is clearly inconsistent with its statutory mission or other state policy." Ibid. We are bound to "defer to an agency's expertise and superior knowledge of a particular field." Greenwood v. State Police Training Ctr., 127 N.J. 500, 513, 606 A.2d 336 (1992). Moreover, our scope of review of an agency's action is limited to determining whether there is sufficient credible evidence in the record to support the agency's decision or action. Clowes v. Terminix Int'l, Inc., 109 N.J. 575, 588, 538 A.2d 794 (1988).
We have carefully considered plaintiff's arguments on this point and we are convinced that they lack sufficient merit to warrant lengthy discussion. R. 2:11-3(e)(1)(E). Suffice it to say that the Law Division lacked jurisdiction from the outset to hear an appeal from an administrative agency. R. 2:2-3(a)(2); In re Senior Appeals Examiners, 60 N.J. 356, 363, 290 A.2d 129 (1972); In re Grievance of Trans. Emp., 120 N.J.Super. 540, 295 A.2d 369 (App.Div.1972), certif. denied, 62 N.J. 193, 299 A.2d 727 (1973). Since the Law Division lacked jurisdiction to hear the interlocutory administrative appeal in the first instance and the DOE, through the OAL, was vested with authority to hear plaintiff's due process petition respecting the IEP, the cases should not have been consolidated after the unsuccessful mediation; there was no error in Judge Kumpf's order remanding it. N.J.S.A. 52:14B-1 to -24; see, e.g., Infinity Broadcasting Corp. v. N.J. Meadowlands Com'n, 187 N.J. 212, 223, 901 A.2d 312 (2006); Pascucci v. Vagott, 71 N.J. 40, 53, 362 A.2d 566 (1976).

II
Plaintiff next contends that she was denied a fair trial in the Law Division as a result of the change in venue from Somerset to Hunterdon County pursuant to plaintiff's own motion.
On August 18, 2005, shortly before the trial was originally scheduled to begin in Somerset County, plaintiff requested that the case be tried in the new Somerset County Courthouse because J.G.'s wheelchair could not fit into the witness box in the courtroom to which they had been assigned in the old courthouse. Plaintiff insisted that it was "extremely important that [J.G.] testify from the same witness area that other individuals testify from." Plaintiff further requested that a ramp to the witness box be installed in the new courtroom. Plaintiff was advised that the new courthouse did not have wheelchair-accessible witness boxes and that there was no ramp available to be installed. She then moved for a change of venue, arguing that "[a] reasonable accommodation would be to provide plaintiff with a fully accessible courtroom which is located a short distance away in Hunterdon County." Plaintiff's motion was granted and the matter was transferred to a fully ADA-accessible courtroom in Hunterdon County.
Plaintiff argues that her request for accommodations to allow J.G. access to the Somerset County Courthouse and its witness boxes should have been granted because the perceived problems could have been "easily rectified." There is nothing in the record, however, indicating that plaintiff ever requested that a witness box be placed on the ground level of the courtroom so that everyone could testify from there. Nor, did she present any evidence to support her contention that J.G. would have been prejudiced by testifying from the well of the courtroom rather than the jury box.
Plaintiff next contends that she was prejudiced by the change in venue because: (1) the jurors in Hunterdon County *717 were likely displeased that their tax dollars had to be used to accommodate J.G.; (2) the jurors were possibly influenced as to the merits of the case by the fact that Somerset County had not deemed it necessary to accommodate J.G. with his courtroom requests; (3) the jurors in Hunterdon County likely did not care about possible discrimination by a school district in Somerset County; (4) the Hunterdon County jurors possibly possessed attitudes unique to Hunterdon County as a result of that county's different economic and social makeup; and (5) her attorneys lost valuable preparation time by being forced to drive an additional forty-five minutes each way to trial.
Plaintiff has presented no evidence to support her contentions impugning the impartiality and diligence of the Hunterdon County jurors. Her arguments on those points are speculative and do a disservice to the jurors who gave their time and attention through twenty days of trial. Moreover, plaintiff has identified no deficiency in the performance of her attorneys as a result of the increased travel time. A litigant is entitled to a fair trial, not a perfect one. State v. Biddle, 150 N.J.Super. 180, 183, 375 A.2d 283 (App.Div.1977). The trial was transferred to Hunterdon County at plaintiff's request. She cannot now complain that the Hunterdon jurors were less sympathetic to her cause or that the travel time was too great a burden. Regents of the Mercersburg College v. Rep. Franklin Ins. Co., 458 F.3d 159 (3d Cir.2006); Bd. of Trs. of the Univ. of Ala. v. Garrett, 531 U.S. 356, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001).

III
Plaintiff next contends that the trial court committed reversible error in denying her pretrial motion to be declared a prevailing party as to the high school access issues.
Prior to trial, plaintiff moved in limine to be declared a prevailing party under the LAD and the ADA, entitling her to damages and counsel fees. Specifically, she argued that after she filed the lawsuit and presented defendants with an expert report detailing the deficiencies in the high school, defendants complied with their statutory obligations by replacing one lift, ordering another and designating an existing female faculty bathroom as a "unisex" bathroom available to J.G. Relying upon Warrington v. Village Supermarket, 328 N.J.Super. 410, 746 A.2d 61 (App.Div. 2000), plaintiff insists that she had demonstrated the requisite nominal success on her claims.
At a hearing on plaintiff's motion, defendants argued that, contrary to the opinion of plaintiff's expert, the high school was already statutorily compliant prior to the filing of plaintiff's complaint. Defendants demonstrated that the lift was replaced, not because of the expert report, but because it was irreparably broken. They further demonstrated that a handicap-accessible boys' bathroom was always available to J.G. at the high school and the women's faculty bathroom was simply set up as an alternative since J.G. had female aides.
In ruling on plaintiff's motion, the trial court initially observed that it would be premature to declare a prevailing party since defendants continued to maintain that the high school was always statutorily compliant and that the at-issue changes had been made for other legitimate reasons. In the court's view, the position taken by defendants left all issues in the case for the jury to resolve. We agree.
Plaintiff argues that she should have been declared a prevailing party prior to trial because her lawsuit served as the *718 "catalyst" that prompted the changes. Her argument fails in the face of Buckhannon Bd. & Care Home v. W.Va. Dep't of Health & Human Res., 532 U.S. 598, 605, 121 S.Ct. 1835, 1840, 149 L.Ed.2d 855, 863 (2001), in which the United States Supreme Court held that the "catalyst" theory was not a permissible basis for the award of attorney fees under several federal statutes, including the ADA, and that fees could only be awarded under that statute where there was a judgment on the merits or a settlement agreement enforced through a consent decree. In Baer v. Klagholz, 346 N.J.Super. 79, 82-83, 786 A.2d 907 (App.Div.2001), certif. denied, 174 N.J. 193, 803 A.2d 1165 (2002), we held that Buckhannon was binding in New Jersey when the counsel fee provisions of federal statutes were at issue.

IV
Plaintiff contends that the trial court committed plain error in admitting the testimony of Anthony Sciarrillo, the Board's counsel, because he was not on defendants' witness list.
On the sixth day of trial, plaintiff sought to admit into evidence Sciarrillo's September 15, 2000 letter to plaintiff's counsel regarding the arrangements for J.G.'s sixth grade placement. Defendants immediately objected but the trial court tentatively ruled that the letter was admissible as an admission by an authorized representative. In light of that ruling, defendants then requested that Sciarrillo be permitted to testify as to the meaning of the letter. Plaintiff made no objection to this request and the court agreed that, if the letter went in, this would be an appropriate way to deal with the matter.
Sciarrillo testified that he had repeated discussions with plaintiff's counsel regarding J.G.'s sixth grade placement over the summer of 2000. He noted that, although the only place for regular sixth grade classes was in the Somerset School, plaintiff's counsel maintained that the Somerset School was physically inaccessible for J.G. Although both counsel participated in an IEP meeting on July 19, 2000, during which the Somerset School placement was offered, plaintiff's counsel continued to voice concerns and nothing was resolved. Neither plaintiff's counsel nor plaintiff made themselves available for followup meetings before the beginning of the 2000 school year.
Sciarrillo further testified that on September 15, 2000, he and plaintiff's counsel conferred with the ALJ hearing plaintiff's administrative petition. Sciarrillo advised that, although defendants were offering placement at the Somerset School, an IEP had not been finalized because of plaintiff's concerns. The ALJ directed Sciarrillo to send a letter to plaintiff's counsel setting forth the available options under the circumstances. That same day, Sciarrillo faxed the letter to plaintiff's counsel offering placement in Stony Brook School supplemented by home instruction. The letter expressly noted that the placement was being offered "pending the resolution of the outstanding issues," and included an addendum directed to the ALJ indicating that the letter merely outlined the "current" status of the matter.
"Ordinarily unnamed witnesses should be permitted to testify where the failure to supply their names in discovery was not the result of a design to mislead and where there was no surprise or prejudice to the opposing party if the testimony were to be allowed." Brown v. Mortimer, 100 N.J.Super. 395, 401, 242 A.2d 36 (App. Div.1968). We find no error in the trial court's admission of Sciarrillo's testimony. Plaintiff opened the door by offering the September 15, 2000 letter into evidence and cannot now claim that she was prejudiced *719 by Sciarrillo's testimony. R. 2:10-2. The trial court properly allowed Sciarrillo's testimony. Brown, supra, 100 N.J.Super. at 401, 242 A.2d 36; Casino Reinvestment Dev. Auth. v. Lustgarten, 332 N.J.Super. 472, 497, 753 A.2d 1190 (App.Div.) certif. denied, 165 N.J. 607, 762 A.2d 221 (2000).

V
Plaintiff contends that the trial court committed reversible error in precluding testimony from one of her attorneys, Francine Gargano.
Prior to trial, defendants objected to Gargano being named as a potential witness. The court noted that, under R.P.C. 3.7, Gargano could not appear as counsel and be a witness. Plaintiff argued that if Gargano were called, it would only be on rebuttal. The court, however, reiterated that if Gargano participated in the trial, she would be precluded from testifying, unless a "surprise" situation involving "some unusual circumstances" occurred.
Gargano chose to continue as trial counsel and participated extensively in the trial. At the conclusion of defendants' case, plaintiff stated there would be no rebuttal testimony, thereby waiving any claims that Gargano should have been permitted to testify as a rebuttal witness. Plaintiff has not demonstrated any prejudice resulting from the court's ruling on this issue. R. 2:10-2. Consequently, we find no merit in this argument. R. 2:11-3(e)(1)(E).

VI
Plaintiff contends that the trial court committed reversible error in admitting the testimony of Wendy Ng, a special education teacher at the high school, because she was not on defendant's witness list.
Early in the trial, J.G. testified on direct as follows:
[Plaintiff's counsel]: What bathroom did you go use in the fourth grade, the boy's room or the girls' room?
[J.G.]: The girls' room.
[Plaintiff's counsel]: What bathroom did you use in fifth grade?
[J.G.]: The girls' room.
[Plaintiff's counsel]: What bathroom did you use in sixth grade?
[J.G.]: The girls' room.
. . . .
[Plaintiff's counsel]: In seventh grade, [J.G.], did you use the girls' room or the boys' room?
[J.G.]: Thank God I used the boys' room.
[Plaintiff's counsel]: And eighth grade?
[J.G.]: Thank God I used the boys' room . . .
[Plaintiff's counsel]: Ninth and tenth grade?
[J.G.]: Ninth grade I still used the boys' room, tenth grade unfortunately I am back to using the womens' faculty bathroom.
The following day, defendants advised the court that they intended to present Ng's testimony to rebut J.G.'s testimony regarding his tenth-grade bathroom usage. Noting that plaintiff could still depose Ng, the trial court indicated that it was "comfortable" with allowing Ng's testimony over plaintiff's objection. Ng subsequently testified that she observed J.G., as a tenth grader, using the boys' bathroom in the high school cafeteria several times each week.
We have carefully considered the record in light of plaintiff's arguments on this issue and we find no abuse of the trial court's broad discretion in admitting this rebuttal evidence. Lustgarten, supra, 332 N.J.Super. at 497, 753 A.2d 1190. Ng's testimony was limited, not cumulative or *720 repetitive. Plaintiff was able to cross-examine Ng as to her observations and the fact that she learned of J.G.'s testimony from a newspaper article.

VII
Plaintiff contends that she was denied a fair trial because the trial judge discriminated against [J.G.].
Immediately after his opening statement, outside of the presence of the jury, defense counsel made an application that resulted in the following colloquy:
[Defense counsel]: Regretfully I must bring this motionor this application. I am going to ask the Judge to direct the plaintiff not to make noises, laugh, giggle, and everything else during my presentation of the case. It was pretty obvious to me that it was being done. And I recognize that [J.G.] has some disabilities and may not be able to control all of his emotions, but if he can't do it, I am going to ask that he be removed from the court because it's distracting to the jury. He'd laugh, the jury would look at him while I was giving my opening. And it's . . . I hate to say disrespectful but it is disrespectful.
THE COURT: I think there are two issues. Number one, was the jury distracted. I know I noticed it but I had a more direct view of [J.G.] maybe than the jury, and was it . . . distracting[,] I doubt it.
But the second issue is should it go on just as a matter of decorum in the courtroom. And it does appear to me observing the situation that there were a lot more reactions to [defense counsel's] opening than there were to [plaintiff's counsel's]. So I share some of his concern. We all, I thinkI have watched both . . . [plaintiff and plaintiff's counsel] attempt to deal with the situation, but really it has to be equal. Whatever [J.G.'s] feelings about the case . . . he can express them no more than any of you could, counsel, or any other witness.
. . . .
I don't see any need from what I have heard at this point to contemplate excluding, it would be a very drastic step. But if he is the good student everyone agrees he is, and he is as perceptive as I am hearing the testimony he is, he should be able to deal with the situation and keep his feelings in check just as . . . any witness or any party would do.
So I am going to direct that that be done.
Plaintiff's counsel represented that J.G.'s reactive behavior was not deliberate but was caused by his cerebral palsy. The court pointed out, however, that J.G. had not been reactive during the initial jury instruction nor during plaintiff's counsel's opening. The court stated that it had to ensure that the trial was fair to both sides and encouraged plaintiff's counsel to address the matter with J.G. over the lunch break.
Plaintiff now argues that the trial court erred by "going along with" defense counsel's initial application regarding J.G.'s incourt behavior. We find nothing in the record to support that argument.
Later that day, at sidebar, the trial judge asked counsel whether the jury should be told to advise the court if they found J.G. "doing something that distracts them." The judge specifically stated that he did not want the jury "to focus on [J.G.] as being some kind of very different person" but, "[i]f he is the way he is, it is the way he is, we can't change that." Counsel agreed to collaborate on an appropriate instruction, if needed, and the matter was dropped for the moment. Plaintiff stated that she would bring a doctor's note explaining the effects of J.G.'s cerebral palsy *721 on his behavior. The note was never provided, however.
The next day, while plaintiff was on the witness stand, defense counsel objected to plaintiff's hearsay testimony and the court called counsel to sidebar. While counsel and the court were involved at sidebar, J.G. began crying and left the courtroom. Plaintiff's counsel noted during sidebar that the jury had witnessed his behavior and requested that something be said. After some discussion, plaintiff's counsel agreed that an instruction was not necessary at that point. Nevertheless, the trial judge told counsel that he would take direction from them as to when to intervene and what to say. Counsel agreed. The judge stated, "[s]omehow or other we are going to have a fair trial here with respect to this young man."
The trial proceeded thereafter, largely without incident. During his testimony, J.G. explained that he has more difficulty controlling his body if he is upset or nervous, resulting in unexpected movements. Later, the trial court interrupted the testimony of Board member Mary Elizabeth O'Connor regarding accessibility of the bathrooms and addressed the jury as follows:
Let's just hold for a minute here. Let's  all right. I will just note for the record that there was apparently an incident of discomfort on the part of the Plaintiff, [J.G.]. Of course, the jury is not to draw any inference one way or another as to why that might have occurred, or any inference about the case from that situation.
There is no indication in the record as to what triggered the court's comment. Notably, plaintiff's counsel did not object to this instruction. Plaintiff now argues, however, that the trial judge committed reversible error by pointing out J.G.'s behavior, which plaintiff alleges the court did solely to frighten and humiliate J.G.
Plaintiff further insists that the trial judge improperly made "constant" comments to the jury about J.G.'s discomfort, thereby discriminating against him. We have carefully reviewed the extensive trial record and we find nothing to support that claim. Rather, the record reflects only the one instance noted above when the court made a sua sponte comment to the jury and plaintiff's counsel failed to object. When the court raised the question of J.G.'s discomfort at sidebar, the court's obvious goal was to solicit counsels' thoughts on the best way to handle any developing situation. Nothing in the record leads us to conclude that the trial court discriminated against J.G.

VIII
Plaintiff further contends that she was denied a fair trial as a result of improper judicial interference. A judge must "conduct [a] trial in a fair and impartial manner, without making remarks that might prejudice a party or which are calculated to influence the minds of the jury." Cestero v. Ferrara, 110 N.J.Super. 264, 273, 265 A.2d 387 (App.Div.1970), aff'd, 57 N.J. 497, 273 A.2d 761 (1971). A judge should never unfairly criticize or humiliate counsel, especially in front of the jury. Mercer v. Weyerhaeuser Co., supra, 324 N.J.Super. at 298, 735 A.2d 576. A judge's failure to abide by these guidelines "can easily prejudice a jury since it conveys the opinion of the judge as to his [or her] belief or disbelief in one side of the case." State v. Zwillman, 112 N.J.Super. 6, 21, 270 A.2d 284 (App.Div.1970), certif. denied, 57 N.J. 603, 274 A.2d 56 (1971). Nevertheless, a trial court has wide discretion in controlling the courtroom and the court proceedings. Ryslik v. Krass, 279 N.J.Super. 293, 297, 652 A.2d 767 (App.Div.1995). *722 Alleged misconduct by a trial judge must be reviewed within the context of the entire record in order to determine whether it had prejudicial impact. Mercer v. Weyerhaeuser Co., 324 N.J.Super. 290, 298, 735 A.2d 576 (App.Div.1999)
We have carefully reviewed the extensive record of this lengthy trial, along with the pre- and post-trial proceedings, and we find no evidence to support plaintiff's numerous claims of prejudicial conduct by the trial court. Indeed, we are impressed with Judge Peter Buchsbaum's efforts to ensure that both parties had a level playing field and a fair trial. Judge Buchsbaum exercised great patience during this lengthy, difficult and sensitive trial. He conducted the proceedings well within the bounds of judicial conduct.

IX
Finally, plaintiff argues that the trial court erred in denying her motion for a new trial based on the weight of the evidence. Rule 4:49-1(a) provides that a trial court must grant a motion for a new trial "if, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly appears that there was a miscarriage of justice under the law." Dolson v. Anastasia, 55 N.J. 2, 7, 258 A.2d 706 (1969). We must adhere to essentially the same standard when reviewing a trial court's action on a motion for a new trial. We must give deference to the trial court's feel of the case as to matters such as the demeanor and credibility of witnesses, but otherwise we conduct an independent review of the record to determine the fairness of the result. Carrino v. Novotny, 78 N.J. 355, 360-61, 396 A.2d 561 (1979); Baxter v. Fairmont Food Co., 74 N.J. 588, 597-98, 379 A.2d 225 (1977). "An appellate court may overturn a jury verdict `only if [that] verdict is so far contrary to the weight of the evidence as to give rise to the inescapable conclusion of mistake, passion, prejudice or partiality.'" Kassick v. Milwaukee Elec. Tool Corp., 120 N.J. 130, 134, 576 A.2d 270 (1990) (quoting Wytupeck v. City of Camden, 25 N.J. 450, 466, 136 A.2d 887 (1957)); accord JMB Enterprises v. Atl. Employers Ins. Co., 228 N.J.Super. 610, 616, 550 A.2d 764 (App.Div.1988).
In her new trial motion, plaintiff argued that the jury's verdict was plainly erroneous since Sciarrillo's September 15, 2000 letter was an admission by defendants that the Somerset School was not ADA compliant. She further claimed that the record was clear that no effort had been made at Somerset School to accommodate J.G.'s bathroom needs or his power wheelchair and that J.G. was blatantly discriminated against when he was deemed an impediment in the hallways.
In its decision denying plaintiff's motion, the trial court initially observed that each "fact" plaintiff continued to allege as indicative of discrimination, was subjected to a great deal of "cross testimony [and] countervailing facts." The court observed that the jury's assessment of the credibility of plaintiff and J.G. might have been affected by their testimony. The court noted that there was "a great difference in the way [plaintiff and J.G.] responded to questions in direct [testimony], with a great deal of animation," contrasted with the "frequent `I don't knows' or `I don't remembers' on cross." The court noted that J.G.'s testimony that he didn't remember certain things could have led the jury to conclude "that some of the incidents were not as severe as he might have posed them." The court further noted that plaintiff's credibility was also likely affected by her claim that she had no idea there was going to be a demonstration on September 18, 2000, which was wholly belied by her extraordinary behavior on that date. *723
Moreover, the court was not persuaded that Sciarrillo's letter of September 15, 2000 was conclusive proof of discrimination. The court noted initially that the letter "was a serious piece of evidence in favor of the plaintiff. . . . Viewed in isolation, [it] basically says: Stay out of our school." When viewed in the context of what was happening at the time, however, the letter had a different import and "[t]he jury was entitled to believe that there was some kind of miscommunication or some kind of direction that was involved in that letter going out at the time it did with respect to . . . what counsel thought his obligations were to the administrative law judge." The court concluded that taken in context, the September 15 letter was not conclusive proof of discrimination. We agree.
Our review of the twenty-day trial record has convinced us that the verdict was more than adequately supported by the evidence and there was no miscarriage of justice. R. 4:49-1(a); Dolson, supra, 55 N.J. at 6, 258 A.2d 706.
Affirmed.
NOTES
[1] We note that J.G. has completed high school and we were advised at oral argument that he is now in college.