**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1499-18T2

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

GARY W. JONES,

    Defendant-Appellant.

_____

Argued January 9, 2020 – Decided March 17, 2020

Before Judges Alvarez and Nugent.

On appeal from the Superior Court of New Jersey, Law Division, Union County, Indictment No. 17-04-0304.

Michael James Confusione argued the cause for appellant (Hegge & Confusione, LLC, attorneys; Michael James Confusione, of counsel and on the brief).

Meredith L. Balo, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for respondent (Lyndsay V. Ruotolo, Acting Union County Prosecutor, attorney; Meredith L. Balo, of counsel and on the brief).

PER CURIAM

A jury convicted defendant Gary W. Jones of first-degree armed robbery, N.J.S.A. 2C:15-1(a)(1); the lesser-included third-degree aggravated assault, N.J.S.A. 2C:12-1(b)(2); second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b)(1); second-degree possession of a weapon for unlawful purpose (handgun), N.J.S.A. 2C:39-4(a)(1); fourth-degree aggravated assault with a firearm (pointing), N.J.S.A. 2C:12-1(b)(4); and fourth-degree obstruction, N.J.S.A. 2C:29-1(a). The jury acquitted defendant of third-degree resisting arrest, N.J.S.A. 2C:29-2(a)(3)(A) and 2C:29-2(a)(3)(B). On that same day, defendant entered a guilty plea to second-degree certain persons, N.J.S.A. 2C:39-7(b)(1), charged in a separate indictment.[1] After merging the possession of a weapon and pointing convictions with the first-degree robbery, the judge sentenced defendant to a discretionary persistent offender extended term of fifty years subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. See also N.J.S.A. 2C:44-3(a) and 2C:43-7(a)(2). When sentenced, defendant was forty-five years old. We now affirm the convictions, vacate the sentence, and remand for a new sentence to be imposed.

---

[1] From the sentencing transcript, it appears defendant filed a pro se motion to withdraw that guilty plea prior to sentencing. No further mention is made in any transcripts or the briefs on this appeal regarding the status of that offense.

A-1499-18T2

The circumstances of the crime, as we describe them, were captured on surveillance tape operated by the City of Elizabeth Police Department and a second surveillance tape, belonging to the store in front of which the robbery occurred. The films, and the stills extracted from them, were shown to the jury. The victim, and police officers who arrived on the scene immediately after defendant's commission of the robbery, testified at trial.

The victim was leaving the store at approximately 10:00 p.m. when defendant, who was armed, approached him and demanded his money. The victim responded that he had nothing and attempted to enter his vehicle, parked immediately in front of the establishment. Defendant followed, grabbed the victim's arm and said, "Oh, you think I'm playing?" The victim replied, "You really want to do this?"

Defendant shot the victim in the leg. The victim began to run towards the nearby police station, while defendant gave chase. Elizabeth Police Officer Jason Luis was driving by when he heard the gunshot. He and his partner, John Londono, immediately looked towards the sound and saw a man running in their direction, with another person close behind. The officers immediately pulled over, and as they left their vehicle heard the man closest to them yell, "He shot

A-1499-18T2

me," pointing to his pursuer. The second man's body was slanted sideways to the officers, his hands at his waistband.

When Luis attempted to stop the second man, the second man began to run "in a full sprint" until he stumbled. Luis tackled him onto the ground and realized he had a gun. Luis knocked the gun aside, and along with Londono wrestled the second man, defendant, until they were able to handcuff him when other officers arrived. The officers arrested defendant and seized his gun.

The officers then drove defendant to the ambulance where the victim was being treated. Luis conducted the show-up, and he testified that before he spoke to the victim, he attempted to recall the identification warnings usually made prior to a photo array or a lineup. He recorded the identification on his bodycam. Luis told the victim that there was no certainty that the person he was about to see was the perpetrator. Before police even removed defendant from the vehicle, however, the victim called out that defendant shot him.

Without conducting a Rule 104 hearing or engaging in any Rule 404(b) analysis, the judge permitted the State to move into evidence counterfeit twenty-dollar bills police found in defendant's wallet when he was processed at the station after arrest. The basis for admission, the prosecutor argued, was that the jury should be informed defendant had no money with him, despite being seen

A-1499-18T2

on the videos looking into his wallet. The State wanted to establish his lack of funds as the motive for the robbery.

When the question was posed to the officer about the counterfeit bills, defense counsel objected. The judge said, in overruling the objection:

> [I]t goes to the motive that we mentioned in opening. I mean, typically, the property collected from a defendant isn't going to be moved into evidence, but the witness testified to why that was distinguished here and why it was part of the evidence bagged, materials, and it cuts to the . . . issue of - - of motive.

Unfortunately, we cannot locate any discussion of the admissibility of the evidence in the record prior to the above.

The prosecutor argued in closing that despite defendant being depicted on the film as looking at his wallet, which appeared to have bills inside, the money was counterfeit and he only had two cents on him. We address defendant's sentence proceeding more fully in the relevant section of the opinion.

On appeal, defendant raises the following points for our consideration:

> Point 1
> The 50 year extended term sentence is clearly excessive and not sufficiently justified by the record.
>
> Point 2
> The trial court erred in denying defendant's motion for acquittal.

5

Point 3
Improper other wrongs and crimes evidence was placed before the jury that caused an unfair trial on the charges at issue.

I.

We first address defendant's second claim of error, which requires only brief discussion. At the close of the State's case, defendant made a motion for the entry of a judgment of acquittal pursuant to Rule 3:18-1. Applying the same standards used by the trial court to deny the motion, it is clear that the State's overwhelming proofs meant that a reasonable jury could readily find that defendant committed the armed robbery beyond a reasonable doubt. See State v. Tindell, 417 N.J. Super. 530, 549 (App. Div. 2011).

Defendant contends the standard set forth in State v. Reyes, 50 N.J. 454, 458-59 (1967), was not met because the videos do not show defendant actually holding a gun while attempting to rob the victim. Furthermore, defendant called as a witness one of the responding officers, who testified he conducted a separate search for the gun. Defendant argues this casts reasonable doubt on Luis's testimony that he recovered the weapon immediately upon arresting defendant.

Giving the State the benefit of all reasonable testimony, however, it is clear that the officer who was called by defendant as a witness did not cast doubt on the credibility of his colleagues. It was no doubt a chaotic crime scene—

6

approximately six officers arrived within minutes of the robbery while an injured victim was placed in an ambulance, and several officers struggled to subdue the suspect. It is not surprising that one officer not engaged in defendant's immediate arrest or the victim's care would have heard that a gun was involved, and on that information engaged in a quick search.

The victim testified unequivocally that the perpetrator was defendant. The videos clearly established defendant's presence at the scene and movements corroborating the victim's narrative. Luis and Londono saw defendant chasing the victim, and Luis never lost sight of him. When Luis was finally able to subdue defendant, Luis slapped the gun away. No further discussion of the point is necessary. See R. 2:11-3(e)(2).

## II.

We turn to defendant's third point. The impecunious condition of a person who commits a theft-type crime is generally inadmissible. "Undoubtedly a lack of money is logically connected with a crime involving financial gain. The trouble is that it would prove too much against too many." State v. Mathis, 47 N.J. 455, 471 (1966). There are a few exceptions to the general rule; none come to mind here. In fact, the distance between the cameras and the contents of defendant's wallet mean no detail was visible. The wallet could have been filled

A-1499-18T2

with anything, thus there was no need to prove "motive" by informing the jury of defendant's commission of an unrelated crime—the possession of counterfeit bills.

Trial judges have broad discretion regarding the admissibility of evidence, certainly as to the logical connection between evidence and a consequential issue in the case. State v. Nelson, 173 N.J. 417, 470 (2002). Such decisions are overturned only where there is a palpable abuse of discretion, a decision so wide of the mark that a manifest denial of justice occurred. State v. Cole, 229 N.J. 430, 449, 453 (2017).

In this case, the standard of review is different. The judge should not have ruled until he conducted a Rule 404(b) hearing outside the presence of the jury. See State v. Cofield, 127 N.J. 328, 338 (1992). Since the alleged error relates to other crimes evidence—or in this case, of even greater import, a concurrent crime—and no Cofield analysis took place—review is de novo. See State v. Goodman, 415 N.J. Super. 210, 228 (App. Div. 2010). The judge appears not to have addressed the issue at all until defense counsel objected to the admission, and he simply overruled the objection.

In addition to being inadmissible as motive evidence, absent some specific exception, defendant's possession of counterfeit money does not pass the Cofield

A-1499-18T2

test for admissibility as other crimes evidence. In order to establish that the evidence meets the Cofield test for inclusion, the State must demonstrate that it is relevant to a material issue, similar in kind and time to the offense charged, clear and convincing, and the probative value must not be outweighed by the apparent prejudice. 127 N.J. at 338.

As to prong one, relevance to a material fact, the connection between defendant's possession of counterfeit bills and a motive to rob is tenuous at best. The counterfeit bills did not have a tendency in reason to prove or disprove any fact of consequence. See State v. Darby, 174 N.J. 509, 519 (2002).

The fourth prong of the test is not satisfied either. Given the at best tenuous connection between the counterfeit bills and the robbery, the probative value of the evidence is not outweighed by the apparent prejudice.

Had the judge engaged in a Cofield analysis, he would no doubt have concluded, as we do, that the evidence was inadmissible. Compounding the error, the judge did not instruct the jury as to the limited use of the evidence when the arresting officer testified about the counterfeit bills, or in the final charge. Such instructions are essential. See State v. Garrison, 228 N.J. 182, 200-01 (2017).

In the final analysis, however, the admission of the counterfeit money was harmless error; it was not "clearly capable of producing an unjust result." R. 2:10-2. The State's proofs were so overwhelming that the error does not raise a reasonable doubt that it might have led the jury to a result it otherwise would not have reached. See State v. Prall, 231 N.J. 567, 581 (2018) (quoting State v. Daniels, 182 N.J. 80, 95 (2004)). Placed in the context of the videos and eyewitness testimony, it is not a basis for reversal.

III.

Finally, we address defendant's contention that his fifty-year NERA extended-term sentence was excessive. In State v. Liepe, 239 N.J. 359 (2019), the Court reiterated that in reviewing a sentence, we do not ordinarily substitute our judgment for that of the sentencing court. Id. at 370-71. If we find an error in sentencing, it "must amount to more than a difference of opinion or individual sentencing philosophy. The sentencing objectives are spelled out in the [New Jersey Code of Criminal Justice]. It is deviation from those objectives, in view of the standards and criteria therein set forth, which constitute error." State v. Roth, 95 N.J. 334, 365 (1984).

Our review of a sentence is limited to consideration of:

> (1) whether guidelines for sentencing established by the Legislature or by the courts were violated; (2) whether

10                                                                    A-1499-18T2

the aggravating and mitigating factors found by the sentencing court were based on competent credible evidence in the record; and (3) whether the sentence was nevertheless "clearly unreasonable so as to shock the judicial conscience."

[Liepe, 239 N.J. at 371 (quoting State v. McGuire, 419 N.J. Super. 88, 158 (App. Div. 2011)).]

In sentencing defendant, this judge praised the attorneys—and demeaned the defendant over the course of a lengthy hearing. He told defendant that his family "love[s] you so much that they buy into anything that you say – sir, get a clue[,]" and that they wasted their time coming to court to support him. He referenced two songs while sentencing defendant: "When Will They Ever Learn?" and "Puff the Magic Dragon." The judge acknowledged the sentence he imposed at the State's request of fifty years subject to NERA, was "a lifetime sentence." After that comment, he returned to the musical theme, asking rhetorically "When will they ever learn?"

The judge told defendant:

You had your eyes on him. You waited for him. You calculated. You picked him. You chose him.

You talked to your buddies or whoever the morons were that were standing around outside and did not a goddamn thing to help except run when this happens.

The judge discussed the victim's $27,000 in unpaid medical bills and said:

Nobody thinks about it. It's magic. The State pays for it. The hospital absorbs it. Nobody gets charged money when the team of experts come in and save his life. You think that's free? How do you think those doctors pay down their student loans, except they've got to charge? You don't care. You don't think. I don't know that you don't care. You didn't concern yourself with it. Callous, that's not the thing on your hands only. That means how your heart is. It's got callouses on it, if you have one.

[The victim's] got one. Doctors saved his life. I don't know if you have one. You chase him after you shot a bullet through his leg. You don't rescue him. You don't say, oh, my god, what did I do? Someone call 9-1-1. Let me wrap my shirt around your leg. Please stop running. I'm not running after you. I'm running to help you. I threw the gun. Sir, I'm saying I'm sorry. Let me help you. Please, I didn't mean it. Not a chance is that happening. You're running after him and he knew it. Full force he's running, barely, thinking about her. It's nice to meet you, ma'am. [A reference to the victim's wife who had spoken in support of her husband.] I'm sorry for the circumstances.

The judge then repeated, "When will they ever learn?" and "When -- when will you ever learn?" A few minutes later, the judge also repeated that defendant was "callous"—"an antonym of heinous, cruel and depraved[.] You have a callous heart."

The judge found aggravating factors one, three, six, and nine, and no factors in mitigation. See N.J.S.A. 2C:44-1(a)(1), (3), (6), (9). Defendant's

12

criminal history is lengthy and includes juvenile adjudications.[2]  He has been sentenced on ten different occasions between 1991 and 2013 for twelve indictable offenses and served prison and probation terms.  Defendant has violated both probation and parole.  He has also been convicted in municipal court of several offenses.  In discussing defendant's prior prison sentences, the judge said about defendant:  "Going to jail all the times that he has, seven times, he can close his eyes and tell you where the bathrooms and showers and . . . fun area is because he's been there seven times."  After making those findings, he admonished defendant that "an appropriate member of society looks to law enforcement as someone who is there to assist you not someone who is there to chase you."

In discussing deterrence, the judge said that factor might keep some people from breaking the law:

> And society feeling good that this flag and these books aren't a bunch of crap that we just kill trees and put up to collect dust, they mean something -- they mean something so society can say, oh, turn on the TV, only seven people shot in Elizabeth and Newark today.  Isn't that great?

---

[2]  Our discussion of the details of defendant's criminal history is drawn from the presentence report contained in the confidential appendix, not from the sentencing transcript.

A-1499-18T2

There is no doubt that a judge has broad discretion to control his courtroom.  D.G. ex rel J.G. v. N. Plainfield Bd. of Educ., 400 N.J. Super. 1, 26 (App. Div. 2008).  But Rule 3.5 of the Code of Judicial Conduct requires a judge to be "patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom the judge deals in an official capacity. . . ."  "A judge must conduct a trial in a fair and impartial manner, refraining from remarks that might prejudice a party . . . ."  Mercer v. Weyerhaeuser, 324 N.J. Super. 290, 297-98 (App. Div. 1999).

The judge was imposing a legislatively mandated sentence on a convicted person, not passing judgment on him as a human being.  His only task was to fashion a term of imprisonment in accordance with the Criminal Code and do so with patience, dignity, and courtesy.

The judge's commentary calls into question his weighing of aggravating factors one, three, six, and nine, resulting in a fifty-year NERA sentence on a forty-five-year-old man, effectively a life sentence.  This was certainly a heinous crime in that after shooting the victim in the leg during the robbery, defendant chased the victim.  And defendant's prior criminal history made him eligible for extended-term sentencing.

14

By granting the State's application to impose a discretionary extended sentence on defendant, however, the judge substituted the ordinary first-degree NERA term of between ten years and twenty years, N.J.S.A. 2C:43-6(a)(1), with a NERA twenty years to life imprisonment. That was, obviously, a significant increase in the permissible base term of years.

Unquestionably, a defendant's criminal history can be used to support both the extended term decision and the weight accorded factor six. State v. Tillery, 238 N.J. 293, 327-28 (2019). But the real-time consequence of the first-degree NERA extended term required a particularly measured and impartial discussion of the "competent, credible evidence in the record" supporting the relevant aggravating and mitigating factors. "[W]e must . . . be mindful of the real-time consequences of NERA and the role that it customarily plays in the fashioning of an appropriate sentence." State v. Marinez, 370 N.J. Super. 49, 58 (App. Div. 2004). Absent from the record was any explanation of the reason a real-time term of incarceration of approximately forty-two and one-half years was the "appropriate" sentence.

Canon 3, Rule 3.5 states: "A judge . . . shall not . . . display impatience or discourtesy or . . . detract from the dignity of the court." As the Court said in a different context, judges "are held to the very highest standards of

 A-1499-18T2

performance in this state, [although] not infallible." <u>In re Alvino</u>, 100 N.J. 92, 96 (1985). No matter the level of frustration the judge experienced, the judge's weaving of his views regarding the person standing before him into the sentencing calculus did not add to the dignity of the court.

We vacate the sentence and remand. In light of the judge's comments, it would be best for another judge to impose sentence.

Affirmed, except reversed and remanded as to the sentence.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-1499-18T2