**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4996-18

SAMY BOUTROS, individually
and as administrator ad
prosequendum of the ESTATE
OF NADIA ASSAD,

      Plaintiff-Appellant/
      Cross-Respondent,

v.

CHRISTOPHER S. COOK,
KRUSE ASSOCIATES, P.C., and
RICK WAGNER, A/E,

      Defendants,

and

SMITH-SONDY ASPHALT
CONSTRUCTION CO., INC.,
NICOLA GENCHI, P.E.,
STRAIGHT EDGE STRIPING,
ROBERT WALSH ASSOCIATES,
LLC, and ROBERT WALSH, P.E.,

      Defendants-Respondents/
      Cross-Appellants.

_____

Argued January 11, 2021 – Decided August 23, 2021

Before Judges Messano, Suter, and Smith.

On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Docket No. L-1913-16.

Francis X. Dorrity argued the cause for appellant/cross-respondent (Dorrity Law Office, attorneys; Francis X. Dorrity and Tracey A. Dorrity, of counsel and on the briefs).

Richard J. Mirra argued the cause for respondent/cross-appellants Smith-Sondy Asphalt Construction Co. and Nicola Genchi, P.E. (Hoagland, Longo, Moran, Dunst & Doukas, LLP, attorneys; Richard J. Mirra, of counsel and on the briefs).

William H. Mergner, Jr., argued the cause for respondent/cross-appellant Straight Edge Striping (Leary, Bride, Mergner & Bongiovanni, PA, attorneys; William H. Mergner, Jr., and Catherine McGlone, of counsel and on the briefs).

Richard E. Snyder argued the cause for respondent/cross-appellants Robert Walsh Associates, LLC, and Robert Walsh, P.E. (Braff, Harris, Sukoneck & Maloof, attorneys; Elliott Abrutyn and Richard E. Snyder, on the briefs).

PER CURIAM

Nadia Assad was struck and killed by a van driven by her co-worker Christopher Cook as she walked to her car in the employee parking area of the Dominick V. Daniels (DVD) Postal Process and Distribution Center in Kearny.

Individually and as his wife's representative, plaintiff Samy Boutros filed a negligence action against Cook and other defendants involved in the design, re-paving, and striping of the recently renovated employee parking area.

Plaintiff settled his claim with Cook, and other defendants were dismissed before trial proceeded against Robert Walsh Associates, LLC, and Robert E. Walsh individually (Walsh); Smith-Sondy Asphalt Construction Company and its engineer, Nicola Genchi; and Straight Edge Striping (Straight Edge) (collectively, defendants). The judge directed verdicts at the close of plaintiff's case in favor of all defendants except Walsh. The jury unanimously found Walsh was not negligent, and the judge denied plaintiff's motion for a new trial as to all defendants.

On appeal, plaintiff argues he is entitled to a new trial based on erroneous rulings made by the judge, and because the court's "animosity towards plaintiff['s] counsel coupled with its erroneous adverse rulings aggregated to make the trial unfair." Additionally, all defendants filed cross-appeals challenging evidential rulings by the judge and denial of their pretrial motions for summary judgment and various in limine motions; Walsh also cross-appeals from the denial of his motion for a directed verdict at the end of plaintiff's case.

3

We have considered the arguments in light of the record and applicable legal standards. We affirm on plaintiff's appeal and dismiss the cross-appeals as moot.

I.

"A jury verdict is entitled to considerable deference and 'should not be overthrown except upon the basis of a carefully reasoned and factually supported (and articulated) determination, after canvassing the record and weighing the evidence, that the continued viability of the judgment would constitute a manifest denial of justice.'" Hayes v. Delamotte, 231 N.J. 373, 385–86 (2018) (quoting Risko v. Thompson Muller Auto. Grp., Inc., 206 N.J. 506, 521 (2011)). "A trial court therefore grants a motion for a new trial only 'if, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a miscarriage of justice under the law.'" Id. at 386 (quoting Crawn v. Campo, 136 N.J. 494, 511–12 (1994) (quoting R. 4:49-1(a))). We apply the same standard on appeal. Risko, 206 N.J. at 522. However, "when evaluating the decision to grant or deny a new trial, 'an appellate court must give "due deference" to the "trial court's feel of the case."'" Hayes, 231 N.J. at 386 (quoting Risko, 206 N.J. at 522).

A-4996-18

> Although an appellate court has a duty to canvass the record to determine whether a jury verdict was incorrect, that verdict should be considered "impregnable unless so distorted and wrong, in the objective and articulated view of a judge, as to manifest with utmost certainty a plain miscarriage of justice."
>
> [Kassick v. Milwaukee Elec. Tool Corp., 120 N.J. 130, 135 (1990) (quoting Carrino v. Novotny, 78 N.J. 355, 360 (1979)).]

"That is not to say, however, that we must accept the trial court's legal reasoning: '[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference.'" Hayes, 231 N.J. at 386–87 (alteration in original) (quoting Manalapan Realty, LP v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

Because plaintiff's new trial motion was predicated on alleged trial errors, we set forth the standards of review guiding our consideration of those issues. In selecting a jury, a trial court must see to it that the jury chosen is impartial, because "[t]he right to a fair and impartial jury is . . . 'fundamental'" to a fair trial. Pellicer v. St. Barnabas Hosp., 200 N.J. 22, 40 (2009) (quoting Wright v. Bernstein, 23 N.J. 284, 294 (1957)). "We have long relied on our trial court judges to ensure that the selection of jurors is conducted in a manner that will effectuate these rights[,]" recognizing when we conduct our review that the trial judge "is vested with discretion." Id. at 40–41.

5

"In reviewing a trial court's evidential ruling, an appellate court is limited to examining the decision for abuse of discretion." Hisenaj v. Kuehner, 194 N.J. 6, 12 (2008). A new trial is not warranted unless the trial court's evidentiary ruling was "so 'wide of the mark' as to constitute 'a manifest denial of justice' and an abuse of discretion." Id. at 25 (first quoting State v. Wakefield, 190 N.J. 397, 435 (2007)); and then quoting Verdicchio v. Ricca, 179 N.J. 1, 34 (2004)). We apply a similar discretionary standard of review of the trial court's decisions regarding the admissibility of expert testimony. See, e.g., Townsend v. Pierre, 221 N.J. 36, 52 (2015) ("The admission or exclusion of expert testimony is committed to the sound discretion of the trial court." (citing State v. Berry, 140 N.J. 280, 293 (1995)).

With respect to plaintiff's allegations of the trial judge's "animosity" toward counsel and the judge's overall conduct of the proceedings, we have made clear that

> [a] judge must "conduct [a] trial in a fair and impartial manner, without making remarks that might prejudice a party or which are calculated to influence the minds of the jury." A judge should never unfairly criticize or humiliate counsel, especially in front of the jury. A judge's failure to abide by these guidelines "can easily prejudice a jury since it conveys the opinion of the judge as to his [or her] belief or disbelief in one side of the case." Nevertheless, a trial court has wide discretion in controlling the courtroom and the court

6

> proceedings. Alleged misconduct by a trial judge must be reviewed within the context of the entire record in order to determine whether it had prejudicial impact.
>
> [D.G. ex rel. J.G. v. N. Plainfield Bd. of Educ., 400 N.J. Super. 1, 25–26 (App. Div. 2008) (alterations in original) (emphasis added) (citations omitted).]

With these standards in mind, we first review the evidence adduced at trial.

## II.

Ms. Assad was walking to her car in the employee parking area at the DVD shortly before six o'clock on the morning of March 22, 2016, when Cook struck her with his van. Police responded quickly, and, while she was alive immediately after being struck, Ms. Assad expired hours later from a fractured skull.

Cook was arriving at work for the 7:00 a.m. shift; he had worked at the DVD for 26 years and used the 800-car employee parking area daily. Cook was looking for an available parking spot, as close to the entrance of the DVD as possible. He testified that the lighting at the time "wasn't the greatest" and a lot of people were in the parking lot as shifts were changing. Cook came to the end of an aisle of parking spaces, referred to as Aisle 4, intending to make a left turn and proceed to park in the next aisle to the left, Aisle 3. Instead of proceeding out fully into Aisle A, part of a two-way circulation or collector roadway, and

7

then down Aisle 3, without stopping Cook abruptly turned to his left — in vernacular, "cutting the corner" — and struck Ms. Assad, who was crossing in front of Cook's van. A security camera captured the accident as it occurred, and the video recording was played for the jury.

Plaintiff's theory of liability against defendants centered on the design, re-paving and striping of the employee parking lot that began in 2014; the project was completed in the area of the accident in late 2015, several months before the accident. The United States Postal Service (USPS) hired Walsh as the design engineer for the project, and he prepared a series of plans for Smith-Sondy, which the USPS hired as general contractor for the project. Smith-Sondy subcontracted the task of striping the parking lot to Straight Edge.

All defendants moved for summary judgment before trial. A judge, who was not the trial judge, denied those motions. His oral decision indicated that for summary judgment purposes he rejected defendants' arguments regarding the inadequacy of the opinions rendered by plaintiff's experts, or that any failure to provide certain markings, striping or signage could not have proximately caused the accident.[1]

---

[1] The judge entered three orders, one for each defendant. Although denying Smith-Sondy's motion, the order indicated the judge granted summary judgment

A-4996-18

Louis A. DiGeronimo, an architect, testified as plaintiff's expert in the safe design of a parking lot. He explained that a DVD employee leaving the building would first use a striped crosswalk to cross a road used by USPS trucks and continue down a pedestrian path over a bridge before entering the employee parking lot. DiGeronimo testified that after leaving the DVD building, Ms. Assad took this route and then walked across Aisle A before Cook's van struck her as it made a left turn at the end of Aisle 4. DiGeronimo explained that while the original parking lot had diagonal parking, accessible from one-way traffic lanes, the new design by Walsh had perpendicular parking accessible from aisles with two-way traffic.

DiGeronimo criticized the lack of marked pedestrian crosswalks in the parking lot "to visually guide the pedestrian and alert . . . the vehicle traffic that this was a pedestrian area." In addition, he noted that there were no markings for pedestrians in Aisle A, and the road did not have a center dividing line indicating two-way traffic.

DiGeronimo concluded that Walsh breached his duty of care because the design plan "failed to comply with pedestrian safety standards" in the USPS

_____

to Genchi individually, but that he "remain[ed] a defendant in his capacity as a professional."

project design guidelines. In addition, Walsh failed to provide adequate pedestrian safety measures to warn postal employees that a new parking lot design had "radically changed . . . the preexisting traffic pattern." Finally, DiGeronimo opined that Walsh failed to inspect the completed work to ensure his design for striping and road markings in the revised drawings had been fully implemented.

Michael Scarano testified for plaintiff as an engineering expert. According to Scarano, when designing the reconstruction of an employee parking lot with a large amount of foot traffic, a design engineer must consider the safety of both pedestrians and drivers. In addition, Walsh's contract with the USPS required that he take all proper precautions to protect the safety of postal service employees.

Scarano testified that there were no "visual cues," such as a stop sign at the end of the parking aisle, as he had seen "in similar circumstances on many other . . . pedestrian crossing[s]" whenever there was a new traffic pattern. These cues included a clearly delineated pedestrian crosswalk and broken yellow lines in a collector roadway, such as Aisle A, indicating two-way traffic. Even though the collector roadway in the employee parking lot at the DVD, i.e., the predecessor to Aisle A, always handled two-way traffic, Scarano concluded

10

that Walsh's design "greatly increased the risk to pedestrians . . . when compar[ed . . . to] the prior condition." Probably the most significant change, according to Scarano, was that

> [y]ou [previously] had one-way aisles in the vicinity of the accident and they were changed to two-way aisles. Which now doubles the risk of any individual standing at any location within those aisles. You basically now have traffic coming from two directions instead of one.
>
> Combined with that, for someone who would have been used to the parking lot as it was before and now coming into the parking lot with all these two-way aisles, this presents a significantly increased risk as a pedestrian must now face the risk of vehicular traffic from both directions.

Of course, Cook's van did not strike Ms. Assad in a parking aisle, but rather before she entered an aisle.

Scarano added the lack of stop signs and lettering, no pedestrian crosswalks, and no signs indicating there was a new traffic pattern "[we]re all contrary to sound design engineering principles for a facility" of DVD's size. Scarano opined that due to the lack of "sufficient arrows and traffic directory signage, the risk of error and confusion [wa]s significantly increased" everywhere in the lot.

Lee D. Klein testified for plaintiff as an expert in traffic engineering. Prior to reconstruction, the parking lot had angled parking spaces and one-way drive

11

A-4996-18

aisles with directional arrows; any two-way traffic was noted by a yellow center line. With the new design, once a pedestrian entered the main parking area and aisles, there was no identified path, and no pedestrian crosswalk in the area where the accident occurred. There was no marking on Aisle A indicating two-way traffic. In Klein's opinion, due to the volume of traffic and the angle of intersection between the aisles and the circulation road, "it would be recommended to provide visual cues for a driver . . . to direct them to stay to the right of the double yellow line" in Aisle A. He added that "[n]ot only do crosswalks provide visual cues for . . . pedestrians, but [they] also provide[] visual cues for . . . driver[s] to realize that this is a place where pedestrians could be cross[ing.]"

According to Klein, the three basic failures of the parking lot design were the lack of pedestrian crosswalk striping, the lack of center yellow striping, and a lack of two-way directional arrows. This created an unsafe and hazardous condition in the parking lot due to a lack of visual cues for both drivers and pedestrians.

Plaintiff's evidence included other witnesses, as well as short deposition readings from Walsh, Barry Huston, Smith-Sondy's manager for the DVD repaving project, and Andrew Altobelli, the owner of Straight Edge. As noted,

12

the judge granted motions for directed verdicts as to the latter two defendants; he denied a motion made by Walsh.

Huston testified live as a defense witness. He described changes that were made to some of the initial plans drawn by Walsh during conferences with the general manager of the DVD. Huston documented some of these in his work logs.

Walsh testified that he had designed hundreds of parking lots in his thirty-five-year professional career. He submitted a proposed design for the reconstruction of the DVD lot in December 2014 with perpendicular parking on both sides of two-way traffic aisles. The plan's notes reflected that "final proposed striping layout shall be approved by [the USPS] prior to proceeding with the work." The USPS finally approved the final striping plan in August 2015, and that was reflected on a revised site plan Walsh identified at trial.

Walsh said the traffic aisles contained stop bars painted on the ground rather than stop signs because the entire lot was paved and had no landscaping on a raised island where a sign could have been erected. Paving the entire lot was done to make snow removal easier, and the USPS design criteria did not require stop signs, crosswalks or center lines in traffic aisles. As a result of the project meetings and feedback, Walsh revised his drawings again. The

circulation roadway, which included Aisle A, was made wider for easier turning as vehicles exited the parking aisles. All striping was completed by the end of September 2015.

James Peter Quinn, a professional engineer, testified as an expert for Walsh. He opined that the repaved, restriped lot was safer than the previous parking lot. Quinn also testified that design standards did not require a marked crosswalk for pedestrians, or a painted center line in the circulating roadway or parking aisles, nor was there any need for additional signage.

The jury returned a unanimous no cause verdict after deliberating for approximately three hours, some of which was consumed by arranging for the jurors to view again the surveillance video footage.

III.

We address the alleged trial errors that plaintiff claims "clearly and convincingly" demonstrate the directed verdicts and the jury's no cause verdict as to Walsh were "miscarriage[s] of justice under the law." R. 4:49-1(a).

Jury Voir Dire

In his preliminary instructions to the jury venire, the judge explained how plaintiff had settled his claim against Cook, who was no longer a defendant at trial. Twice, he told prospective jurors, "plaintiff claimed that . . . Cook was the

cause of the accident." (emphasis added). There was no objection from plaintiff's counsel. The next day, when a new venire panel arrived, the judge more appropriately said, "plaintiff claimed . . . Cook was <u>one of the causes of the accident</u> but before the trial, Mr. Cook settled with the plaintiff." (emphasis added). It does not appear that plaintiff raised this as an issue when he moved for a new trial, but, in any event, he now claims the judge implied that only Cook, and not the remaining defendants, could be liable. The argument lacks sufficient merit to warrant discussion in a written opinion. <u>R.</u> 2:11-3(e)(1)(E).

Over defendants' objection, the judge agreed to permit the admission of two autopsy photos at trial, even though the cause of Ms. Assad's death was not disputed. Over plaintiff's objection, the judge said he would show them to prospective jurors to "make sure, based upon their review, they still can be fair and reasonable and unbiased and make a decision without sympathy, passion, or prejudice." He then told the panel:

> As part of this trial, we're going to show you some not very pleasant photographs. . . . For lack of a better description. They are not pleasant. We're going to show you photographs and we are going to ask you point-blank whether you can decide this case based upon the facts and the evidence and put aside any sympathy you may have for the plaintiff that you develop as a result of seeing these pictures. That's why we ask you that question.

> When I call you up and show you the pictures, that's what I will ask you. I will say: Can you judge this case fairly and impartially without sympathy in light of these pictures?

As he did when he moved for a new trial, plaintiff claims this implied he intended to play to jurors' sympathy. In denying the new trial motion, the judge noted it was plaintiff who sought to admit the photos, and the procedure he used was effective, because he excused some jurors who said they were unable to judge the case fairly after seeing the autopsy photos. This argument also requires no further discussion. R. 2:11-3(e)(1)(E).

In Limine Rulings on Plaintiff's Experts

Plaintiff argues the trial court erred, both procedurally and substantively, by precluding or restricting his experts' testimony. Specifically, he asserts the judge erred in limiting the experts' ability to testify regarding proximate cause, and in barring entirely the testimony of William Gulya, the principal of an excavation and construction firm, who the judge ruled was not qualified to testify as an expert on any relevant issue. Plaintiff contends these rulings prevented him from establishing a prima facie negligence case against Smith-Sondy and Straight Edge.

Prior to the start of trial, defendants filed in limine motions challenging the admissibility of all plaintiff's experts' opinions as net opinions. The judge

partially granted the motions as to DiGeronimo, Scarano and Klein, ruling only that they could not testify as to proximate cause regarding the actual accident. He explained:

> They can't offer an opinion that they would have followed the line or would have followed the crosswalk . . . . It's not within the purview of their expertise. However, they can give an opinion about why parking . . . lots are stripped [sic]. . . .
>
> The same thing with the crosswalk. . . . [Y]ou can't say for certain that every individual who walks across the street is going to stay within the parameters of those four lines, the rectangle, the crosses. However, you can say this is a general guide to the public as to where they should cross safely. And it's also notice to the driver . . . [to] be wary of pedestrians walking in that crosswalk. So they can't say the person wouldn't have made the turn or they can't say the person would have used the crosswalk. But they can say the basic function of stripping [sic] is to try to mold or guide people to operate safely and walk safely through parking lots and that the guidance wasn't there and as the result of a lack of guidance, the person wasn't guided to drive carefully or wasn't guided to cross the street carefully. . . . So that's the limit of their proximate cause. So Klein, Scarano, DiGeronimo may all testify within these parameters.

The issue arose again briefly during trial, when the judge ruled that DiGeronimo could not testify as to causation, noting the expert said in his deposition that causation was not within the scope of his opinion. The judge again explained, "[A]ll the experts . . . c[an] testify as to why, based upon

17

A-4996-18

engineering principles, stripes are put on the ground. That's their job. But they can't say what Mr. Cook's behavior would or would not have been had the stripes been there."

The judge also granted defendants' in limine motion as to Gulya, concluding he was not qualified to testify as an expert because he lacked any

> special knowledge, education, skill, experience, or training. He is not an architect. He is not an engineer. His expert[ise] [sic] appears to be related to construction sites and construction projects, be it OSHA[2] compliance or performance of the contract as per the plans, but he is involved with construction sites. This is not a construction site. . . . Construction wasn't [sic] done. The theory of liability is the stripping [sic] or lack of stripping [sic] and he has no expertise in that area.
>
> We don't need . . . his expertise to testify that the plans had an arrow and the arrow wasn't drawn. It's not needed. His special knowledge or skill doesn't assist the jury in their fact-finding duties, so I am striking him as an expert for that reason.

Plaintiff renewed his request for Gulya to testify during trial, citing the prejudice occasioned "by the absence of . . . testimony from a . . . contracting expert." Specifically, at that point, plaintiff wanted Gulya to testify regarding

---

[2] Occupational Safety And Health Act, 29 U.S.C. §§ 651 to 678.

the contractor defendants' failure to photograph the preexisting condition of the parking lot.[3] The judge denied the request.

Plaintiff cited the exclusion of Gulya as a witness when he moved for a new trial. The judge noted that Gulya's opinions were based primarily on OSHA standards, "which w[ere] in no way applicable to the case, because the accident did not occur on a construction site. Gulya was not an accident reconstruction expert, nor was he a human factors expert or engineer." In denying plaintiff's motion for a new trial, as to plaintiff's other experts, the judge wrote that their testimony

> only established that the [d]efendant "stripers" (Smith-Sondy and Straight Edge Striping) failed to paint arrows on the new asphalt at a location [that was] in no way related to the occurrence of . . . Cook's car striking [p]laintiff.[4] There was no miscarriage of justice. The

---

[3] Plaintiff sought to imply that defendants failed to follow Walsh's plans, which indicated in notes that the existing striping should be photographed and, unless modified by the USPS, the repaved lot should be similarly striped. Prior to the repaving project, the lot had a center line denoting two-way traffic in the circulating road, including Aisle A. However, as defendants repeatedly pointed out, the note made little sense because the original plan from Walsh retained the "herringbone" parking pattern in one-way parking aisles; the new plan adopted two-way traffic parking aisles with perpendicular parking spots. Thus, a pre-repaving photograph showing the then-existing striping would have been irrelevant.

[4] This was a reference to plaintiff's claim that directional arrows in Aisle A demonstrating two-way traffic were supposed to be painted according to Walsh's

19

> [d]efendant "stripers" were contractually obligated to paint lines and arrows on new asphalt per the plans prepared by [Walsh]. Subsequent to completion of their contractual obligation to "paint," they had no duty to abate hazardous conditions allegedly created by a design deficiency in the plans.

Plaintiff initially argues that the trial judge erred in excluding and limiting the expert testimony by way of an in limine motion after the motion judge had earlier denied defendants' summary judgment motions on similar grounds. However, "an order denying summary judgment is not subject to the law of the case doctrine because it decides nothing and merely reserves issues for future disposition." Gonzalez v. Ideal Tile Importing Co., 371 N.J. Super. 349, 356 (App. Div. 2004), aff'd on other grounds, 184 N.J. 415 (2005); see Blunt v. Klapproth, 309 N.J. Super. 493, 504 (App. Div. 1998) ("Denial of summary judgment preserves rather than resolves issues; therefore, later reconsideration of matters implicated in the motion, including the reasons in support of the denial, are not precluded." (citing A & P Sheet Metal Co. v. Edward Hansen, Inc., 140 N.J. Super. 566, 573–74 (Law Div. 1976))).

---

plans, but were not. However, in granting a directed verdict as to Smith-Sondy and Straight Edge, the judge noted that the area where the arrows were to be painted according to Walsh's plans was some distance away from where the accident occurred. In other words, the absence of arrows could not have been a proximate cause of the accident.

A-4996-18

While plaintiff correctly notes that courts generally disfavor in limine rulings on evidence questions, particularly where the motion seeks the exclusion of expert testimony, a trial judge retains the discretion, in appropriate cases, to rule on the admissibility of evidence pretrial. Seoung Ouk Cho v. Trinitas Reg'l Med. Ctr., 443 N.J. Super. 461, 470–71 (App. Div. 2015). In Cho, we concluded that the grant of the defendant's in limine motion brought the day before jury selection was the equivalent of an untimely summary judgment motion. Id. at 471–72. Here, however, except for Gulya, the trial judge did not exclude plaintiff's experts from testifying. He limited their opinions on proximate cause as to the happening of this accident.[5]

Before turning to the merits of the judge's decision to limit the expert testimony, at the hearing on the in limine motion, the judge observed that "plaintiff has offered no substantive opposition to the motions in limine relative

---

[5] To the extent plaintiff contends the judge should have conducted a Rule 104 hearing before ruling on the in limine motions, we note plaintiff never requested such a hearing. We need not consider the argument. Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973). In any event, plaintiff's experts were all subject to deposition and the trial judge had all the available discovery, thereby obviating the need for a hearing. See Fairfax Fin. Holdings Ltd. v. S.A.C. Cap. Mgmt., LLC, 450 N.J. Super. 1, 100 n.50 (App. Div. 2017) (finding no error in the failure to conduct a Rule 104 hearing because the expert was examined at a deposition and that deposition testimony was available to and considered by the trial court at the time of its ruling).

A-4996-18

to the experts and would procedurally argue that these motions are dispositive and therefore bought as late summary judgment motions. That's it right?" Plaintiff's counsel answered affirmatively. In other words, plaintiff only opposed consideration of defendants' motion by arguing that Cho precluded consideration. He did not argue the merits of defendants' request.

Turning to the substance of plaintiff's arguments, "[t]he issue of causation is ordinarily left to the factfinder." Townsend, 221 N.J. at 59 (citing Fleuhr v. City of Cape May, 159 N.J. 532, 543 (1999)). Undoubtedly, there may be instances where the issue of proximate cause is complex and requires special expertise. In such circumstances, expert testimony is not only helpful for the jury but also required. See, e.g., Quail v. Shop-Rite Supermarkets, Inc., 455 N.J. Super. 118, 135 (App. Div. 2018) (explaining that expert testimony was necessary to explain "the chain of proximate cause" between an accident in the defendant's store and the plaintiff's wife's death five days later). This was not such a case. The judge permitted the testifying experts to explain fully why the lot design and its absence of markings made for an unsafe condition; the only thing he forbade was allowing plaintiff's experts to say those conditions proximately caused this particular accident.

Plaintiff was not at all prejudiced by that limitation. The jury saw a video recording of the accident and could easily relate its occurrence to the alleged breaches in design. The expert testimony that was admitted at trial using the plans as exhibits implicitly established plaintiff's claim, and the jury did not need an expert to explain it. Moreover, plaintiff's inability to prove a prima facie case against Smith-Sondy and Straight Edge had nothing to do with the limit the judge placed on the experts' testimony.

That leaves consideration of the judge's decision to exclude Gulya's testimony. To the extent the judge concluded Gulya lacked the requisite expertise, we disagree. Although he may have lacked professional training, Gulya's years of experience qualified him to opine about appropriate procedures at construction sites and the duties of general and subcontractors. See N.J.R.E. 702 (noting expert may be qualified based on "experience"). However, we agree the exclusion of Gulya as a witness was appropriate for another reason. See Hayes, 231 N.J. at 387 (noting "it is well-settled that appeals are taken from orders and judgments and not from opinions, oral decisions, informal written decisions, or reasons given for the ultimate conclusion." (quoting Do-Wop Corp. v. City of Rahway, 168 N.J. 191, 199 (2001))).

A-4996-18

Gulya's was president of a trenching company that did excavation and construction site preparation. In his report, Gulya stated that Smith-Sondy failed to install "temporary warning signage such as slow[,] construction ahead" near the area "where the work was incomplete." Gulya concluded in his report that Smith-Sondy had "adequate and available resources to remedy and abate the hazardous safety conditions that were obvious prior to and on the day of the . . . accident." The absence of striping created a "clearly recognizable known dangerous condition to exist." He opined that Straight Edge failed to install directional arrows in Aisle A, as indicated on Walsh's plans, and that Smith-Sondy failed to inspect the striping for conformance with the design plan.

In main support of these conclusions, Gulya's report cited the OSHA regulations and manual that dealt with rules at construction sites. He cited contractual provisions between the USPS and Smith-Sondy that imposed safety at the worksite on the general contractor and sub-contractors. However, as the judge noted, the portion of the parking lot where the accident occurred was completed months earlier. There was no ongoing construction.

Moreover, Gulya's opinions largely criticized the same design flaws that plaintiff's other experts addressed. During his deposition, for example, Gulya cited the lack of striped pedestrian walkways, "one-way signs," and double

24

yellow lines for two-way traffic as violations of industry safety standards. There was no underlying support for Gulya's claim that the contractors nevertheless had independent duties to correct any unsafe condition after the work was complete. While we disagree with the trial judge's rationale in barring Gulya from testifying, we affirm his decision.

Most importantly, the absence of Gulya's testimony did not prejudice plaintiff because even had Gulya testified in accordance with his report, the judge would have still properly granted directed verdicts in favor of Smith-Sondy and Straight Edge. At his deposition, Gulya's main criticism of the two contractors was their failure to paint directional arrows in Aisle A as indicated by Walsh's plan. The absence of directional arrows in Aisle A as shown on the plans could not have been a proximate cause of this accident. The trial judge's order barring Gulya as a witness did not lead to an unjust result. R. 2:10-2.

Other Trial Rulings

It is not clear that plaintiff raised these issues in support of his new trial motion, but we address them, nonetheless.

Defense counsel objected when plaintiff's counsel asked a police witness if he had observed pavement markings in another lot at the DVD used exclusively by the USPS trucks. The judge sustained the objection, although he

permitted counsel to have the officer explain the path Ms. Assad traveled through the truck lot to reach the employee parking lot.

Plaintiff argues this was reversible error, because there was a marked pedestrian crosswalk in the truck lot, but not in the employee lot, thereby demonstrating a design flaw. We disagree. The sole issue was the condition of the employee parking lot where the accident occurred. More importantly, plaintiff's experts repeatedly opined that the employee lot should have had a marked pedestrian walkway, and during his testimony, Walsh acknowledged that the striping in the truck lot preexisted the repaving of the employee lot and was necessary because employees at that point traversed tractor-trailer traffic. In other words, the jury was fully aware that the truck lot had a striped pedestrian walkway and the employee lot did not.

Plaintiff contends the judge prejudicially limited his attorney's use of leading questions during Cook's direct examination. Plaintiff does not dispute that the questions were grossly leading, but rather he relies on N.J.R.E. 611(c), which provides:

> Leading questions should not be used on direct examination except as necessary to develop the witness' testimony. Ordinarily, leading questions should be permitted on cross-examination. When a party calls an adverse party or a witness identified with an adverse party, or when a witness demonstrates hostility or

26

A-4996-18

unresponsiveness, interrogation may be by leading questions, subject to the discretion of the court.

According to plaintiff, even though he settled with Cook before trial, the leading questions were appropriate because Cook was "an adverse party."

"'[C]ontrol[ling] and manag[ing] the introduction of testimony' is within the discretion of the trial court, and '[its] decision . . . [is] conclusive unless clearly erroneous as a matter of law.'" Capparelli v. Lopatin, 459 N.J. Super. 584, 609–10 (App. Div. 2019) (alterations in original) (first quoting Hall v. St. Joseph's Hosp., 343 N.J. Super. 88, 107 (App. Div. 2001); and then quoting Bosze v. Metro. Life Ins. Co., 1 N.J. 5, 10 (1948)). We need not get into the technicalities of the evidence rule. The reality of the situation was that Cook did not display any adversity during his testimony, and, while he could not recall many things, he never demonstrated "hostility or unresponsiveness." N.J.R.E. 611(c).

Plaintiff also fails to assert how he was prejudiced by any limitation imposed by the judge. In fact, Cook described the very poor lighting in the parking lot, the significant number of pedestrians exiting the DVD and entering the parking lot, and that complaints about the situation had been brought to the USPS's attention.

27

<u>Use of the Surveillance Video</u>

Plaintiff argues that he is entitled to a new trial because the judge abused his discretion by not permitting him to play the surveillance video during direct examination of his experts. We disagree.

The issue first arose during DiGeronimo's direct testimony, when plaintiff sought to play the video and have DiGeronimo comment on it. Defendants objected, and the judge ruled that because DiGeronimo said at his deposition that the video "played no role in the function he performed as an expert reviewing the design plans of the parking lot," he could not refer to it in front of the jury. The judge added: "[H]e didn't use the video in his analysis and ultimate opinion. That's what he's saying. He's saying the plans are bad . . . . He's saying the video didn't help me form my opinion that the plans were bad." Plaintiff also sought to ask Klein about the video, but the court sustained defendants' objection because Klein also said at his deposition that he did not rely on the video in formulating his opinion.

In denying plaintiff's motion for a new trial as to testimony regarding the video, the judge reiterated that he correctly precluded plaintiff's experts from reviewing it before the jury because they did not reference it in their reports. The judge noted that "DiGeronimo even testified that his responsibility was not

A-4996-18

to review the video of the accident.  Rather . . . to[] 'look at the design . . . as to whether [the expert] performed in accordance with the standard of care.'"

N.J.R.E. 703 provides:  "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the proceeding."  The rule

> mandates that expert opinion be grounded in "facts or data derived from (1) the expert's personal observations, or (2) evidence admitted at the trial, or (3) data relied upon by the expert which is not necessarily admissible in evidence but which is the type of data normally relied upon by experts."
>
> [Townsend, 221 N.J. at 53 (emphasis added) (quoting Polzo v. Cnty. of Essex, 196 N.J. 569, 583 (2008)).]

As a result, "authorization for an expert to base his opinion on what he learns at trial can sometimes excuse his failure to submit a report in advance thereof, and may likewise justify permitting him to testify beyond the four corners of his report[,] if he has submitted one."  Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, cmt. 6 on N.J.R.E. 703 (2021) (first citing State v. Labrutto, 114 N.J. 187, 205–06 (1989); and then citing Amaru v. Stratton, 209 N.J. Super. 1, 11–12 (App. Div. 1985)).  Writing for our court in Amaru, Judge Michels stated the proposition succinctly:  "that an expert's testimony exceeds the scope of written reports requested in discovery does not automatically bar that

A-4996-18

testimony from trial." 209 N.J. Super. 1, 12 (App. Div. 1985). Whether testimony exceeding the scope of an expert's report should be admitted at trial is left to the sound discretion of the trial court. Conrad v. Robbi, 341 N.J. Super. 424, 441 (App. Div. 2001) (citing Ratner v. Gen. Motors Corp., 241 N.J. Super. 197, 202 (App. Div. 1990)); Nicholl v. Reagan, 208 N.J. Super. 644, 652 (App. Div. 1986).

Plaintiff does not dispute that the experts never reviewed the video in preparing their reports; however, the video was in evidence at trial, and we see no prohibition in allowing an expert witness to view it simply because it was not cited in a report furnished in discovery or referenced during deposition. The issue, however, is whether the experts would have offered proper testimony while the video played. Pursuant to N.J.R.E. 702, "[e]xpert testimony is not necessary to tell the jury the 'obvious' or to resolve issues that the jury can figure out on its own." State v. Simms, 224 N.J. 393, 403 (2016) (quoting State v. Nesbitt, 185 N.J. 504, 514 (2006)). "In other words, '[e]xpert testimony should be limited to areas that are beyond the understanding of the jury.'" Ibid. (alteration in original) (quoting State v. Sowell, 213 N.J. 89, 102 (2013)).

There was no dispute as to how the accident occurred in this case. If plaintiff intended to have the experts explain what was obvious from the video,

30

the testimony would have been improper. More importantly, the experts fully explained their opinions for the jury, using Walsh's plans to demonstrate where the shortcomings were and where the accident occurred. The jury saw the video, and it could readily relate what was shown there to the experts' opinions. Even if the judge mistakenly exercised his discretion in prohibiting any questioning of the experts regarding the video, that error was harmless and was not a basis for a new trial.

The Jury Charge

At the charge conference, Walsh objected to the judge charging the jury it could determine the requisite standard of care based on its common knowledge and experience. See Model Jury Charge (Civil) 5.52(C), "Professional Liability of an Architect/Engineer, Common Knowledge May Furnish Standard of Care" (approved Nov. 1995). Plaintiff objected, claiming it was common knowledge that a pedestrian walkway should be marked. The judge rejected that view: "[S]triping on parking lots is not common knowledge to common lay-people. So, they don't know whether or not a standard has been violated." The judge charged the jury in accordance with subsection B of the model charge which discusses the need for expert testimony to prove the appropriate standard of care. In denying plaintiff's new trial motion as to the jury charge, the judge wrote:

 A-4996-18

Jury Charge 5.52[B] has been used in actions for personal injury against architects or engineers. There was a charge conference prior to jury instructions where [p]laintiff was put on notice [that] this charge would be given. There was no objection by [p]laintiff. The charge was appropriate under the facts of the case.

Plaintiff argues that his motion for a new trial should have been granted because the court erred by not charging the jury that the standard of care for professional liability could be established by the jurors' own common knowledge. We disagree.

"In the exceptionally rare cases in which the common knowledge exception applies, . . . an expert is not needed to demonstrate that a defendant professional breached some duty of care 'where the carelessness of the defendant is readily apparent to anyone of average intelligence.'" Cowley v. Virtua Health Sys., 242 N.J. 1, 17 (2020) (quoting Rosenberg v. Cahill, 99 N.J. 318, 325 (1985)). The Model Charge anticipates that, in certain cases, it may be appropriate to charge the jury with both subsection B and C. The accompanying note to the judge states:

Where there has been expert architectural testimony as to the standard of care but the standard is one which can also be determined by the jury from its common knowledge and experience, the jury should determine the standard of care after considering all the evidence in the case, including the expert architectural

32

> testimony, as well as its own common knowledge and experience.
>
> [Model Jury Charges (Civil), 5.52, "Professional Liability of an Architect/Engineer" (approved Nov. 1995).]

In this case, the issue involved whether a pedestrian crosswalk should have been clearly delineated in an employee parking lot with more than 800 parking spaces and multiple parking aisles. If such a crosswalk should have been delineated, where it should have been located, and whether more than one was necessary were issues beyond the ken of an average juror. Perhaps, as the judge noted, most jurors would understand through their collective common knowledge the need for crosswalks on busy streets they walked every day, but whether that was required under professional standards of care at the DVD employee parking lot was not.

Culture of Animosity

In addition to these specific allegations of error by the judge, plaintiff's overarching claim is that the judge displayed such animosity to his attorney that the trial was manifestly unfair and a new one is warranted. Plaintiff does not appear to have raised this issue as a basis for his new trial motion; however, as noted below, plaintiff did seek a mistrial on this issue. We address the issue applying an abuse of discretion standard. D.G., 400 N.J. Super. at 25.

33

A-4996-18

The trial record patently reveals the highly contentious nature of the proceedings. The judge, now retired, did a commendable job maintaining the order and dignity of the courtroom, but only by frequently cautioning counsel, who posed numerous objections, frequently and sarcastically spoke over each other, interrupted the judge and were constantly at sidebar.[6] We provide some limited examples.

During the direct examination of a police officer, one of the earliest witnesses, a defense counsel asked at sidebar to see a copy of the officer's report before it was shown to the witness. The following colloquy then took place:

> Plaintiff's counsel: Your Honor, this is bizarre. Everybody has these.
>
> Defense counsel: I don't care.
>
> Plaintiff's counsel: You be quiet for a moment.
>
> Defense counsel: Excuse me, you're not my father when you tell me what to do.
>
> Plaintiff's counsel: Well, you need a father.
>
> Defense counsel: I have a father.
>
> Plaintiff's counsel: Then you need another one.

---

[6] The contentious nature of the proceedings predated the trial. The deposition transcripts in the record are marred by frequent and improper objections.

 A-4996-18

The judge told the attorneys to "stop," and instructed plaintiff's counsel to show the report to his adversary. After the sidebar ended, plaintiff's counsel told the police officer that he had been requested to show the report to his opponent. Defense counsel interjected that it was a court rule, not a request. The judge then excused the jury and told the attorneys that their actions had required him to be a "babysitter." After the jury returned, another sidebar took place, where a different defense attorney accused plaintiff's counsel of placing photographs of the accident scene on a table where the jury could see them. The court excused the jury for the day, and told the attorneys:

> I'm not going to do this for two weeks. . . . All right? For the record, counsel, you pulled the photographs out and you put them at a [forty-five]-degree angle which is very viewable to the jury. . . . Maybe you didn't do it on purpose. Maybe you did. I don't know. . . . But the bottom line is this . . . . If this culture of animosity continues, I don't believe justice is going to be done. . . . So please, if the four of you can get together and work out your differences without the jury being involved and witnessing it, I think you're all going to be better off.

During subsequent proceedings, the court told counsel, outside the presence of the jury, that the jury had complained about the temperature in the courtroom and the number of sidebars. As to the latter, outside the jury's hearing, the judge said:

> Can we please stop going over to that sidebar? They really can't stand it. . . . [W]e stand over there forever and they're sitting over there freezing.
>
> I can't help with that one either, can I? But these are eight individuals you have chosen to resolve your dispute you're all having over this case and I suggest collectively you do what you can [t]o accommodate their concerns in order for justice to prevail.

During a colloquy outside the jury's presence regarding a diagram he intended to introduce, plaintiff's attorney commented that the court "made" him show the exhibit to the defense, to which the judge replied: "Don't . . . put this on me. . . . [T]he fact that you didn't do what you're supposed to do is not my fault." Plaintiff's counsel responded, "I'm tired of being blamed by the [c]ourt and I think it's inappropriate." The record indicates that the court responded, "You (indiscernible)," and the judge then exited the courtroom.

After trial resumed, and again outside the presence of the jury, plaintiff asked for a mistrial based on the court "berating me in front of my clients on two separate occasions." The judge denied the motion, stating he had not berated counsel and the jury had not been present. Plaintiff's attorney stated that the court should have admonished him in chambers rather than before his clients, and he did "not wish to continue this case before [the judge]." The judge again denied a motion for a mistrial.

A-4996-18

After ruling plaintiff could not use the video during the testimony of his experts, the court sustained a defense objection during redirect of Scarano when plaintiff's counsel sought to reference the video. The judge then instructed the jury that Scarano's testimony was limited to what was in his report, and "[w]hat counsel attempts to do is ask questions outside the report, thus causing the objections. Okay? That's what this . . . two days of consternation is all about."

On the following trial date, during plaintiff's redirect of Klein, the judge again sustained an objection when plaintiff's attorney attempted to ask Klein a question about the video. When counsel requested a sidebar, the judge replied, "No, absolutely not. Continue your examination of your witness."

During defendants' motion for judgment at the close of plaintiff's case, the judge accused plaintiff's attorney of avoiding answering his questions, adding:

> Just like, for example . . . we told you at sidebar not to use the death certificate and you tried anyway, and then you put it down to give the jury the implication that the judge and defense counsel are just beating poor little you up, okay. So I think I'm asking very pertinent questions and you're deliberately not answering them because that's your style.

Plaintiff also points to the judge granting Walsh's objections during plaintiff's summation about claims that his comments were a mischaracterization of the evidence.

37

A-4996-18

In Persley v. N.J. Transit Bus Operations, we held that the court did not abuse its discretion in addressing a "recurring problem" that arose from attempts by the plaintiff's attorney, during cross-examination of expert witnesses, to read favorable portions of the reports of the plaintiff's experts "under the guise of posing questions," after the witnesses stated that they had reviewed those reports and that "it did not change their opinions." 357 N.J. Super. 1, 10 (App. Div. 2003). The court admonished the plaintiff's attorney at sidebar conferences to refrain from this practice, and when he persisted, the court admonished him in the presence of the jury. Ibid. In addition, the judge admonished the plaintiff's attorney in the jury's presence for asking repetitive questions and questions regarding matters not in dispute. Ibid.

We held that in the overall context of the lengthy trial, none of these incidents, individually or collectively, deprived the plaintiff of a fair trial. Ibid. We did "not detect in the judge's demeanor any pervasive criticism of plaintiff's counsel or undermining of plaintiff's case." Id. at 11.

Here, except for the objections during summation, the rulings on which were not accompanied by any comments by the judge, and the denial of a request for a side bar, the only exchange plaintiff points to that took place in front of the jury was the court's statement that plaintiff's attorney attempt to ask questions

38                                                                    A-4996-18

outside the expert's report caused objections resulting in "two days of consternation." While this would have been better left unsaid, it was no worse than the admonishments of the attorney that took place in front of the jury in Persley. Cf. Mercer v. Weyerhaeuser Co., 324 N.J. Super. 290, 299–313 (App. Div. 1999) (reversing where the trial judge imposed a ban on sidebar conferences and chastised the attorney at length in front of the jury, including a reference to the attorney's violation of the Rules of Evidence).

Viewing the trial in its entirety, we cannot conclude the judge's demeanor, comments, or rulings demonstrated prejudice toward plaintiff or his counsel resulting in a miscarriage of justice.

Affirmed. As a result, we dismiss the cross-appeals as moot.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4996-18