**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3901-22

ESTATE OF EUGENE BOEHM,
through GENEVIEVE CLIFTON,
Executor,

     Plaintiff-Appellant,

v.

CARE ONE AT WALL, LLC, d/b/a
CARE ONE AT WALL, CARE
ONE, LLC, DES HOLDING CO.
INC., DES 2009 GST TRUST, and
DES-C 2009 GRAT,

     Defendants-Respondents.

_____

Argued January 21, 2025 – Decided June 24, 2025

Before Judges Sabatino, Gummer and Jablonski.

On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Docket No. L-2248-17.

Jonathan F. Lauri argued the cause for appellant (Stark & Stark PC, attorneys; Denise M. Mariani and Jonathan F. Lauri, of counsel and on the briefs).

Anthony Cocca argued the cause for respondent Care One at Wall, LLC d/b/a Care One at Wall (Cocca & Cutinello, LLP, attorneys; Anthony Cocca and Katelyn E. Cutinello, of counsel and on the brief).

PER CURIAM

This case arises out of the death of Eugene Boehm, who passed away in January 2016, two days after he was admitted to defendants' long-term care facility, Care One at Wall ("Care One").[1] He had suffered a stroke two months earlier in November 2015 and was hospitalized. He was transferred from the hospital to Care One for rehabilitation and respiratory services. According to the death certificate, Boehm passed away due to respiratory failure caused by pneumonia.

After the death was investigated at decedent's estate's request by the New Jersey Department of Health ("DOH"), without yielding any findings of citable deficiencies, the estate filed the present suit in the Law Division against defendants. The suit entailed claims of negligence/malpractice, violations of the New Jersey Nursing Home Responsibilities and Rights of Residents Act (the "NHA"), N.J.S.A. 30:13-1 to -17, and wrongful death.

---

[1] As noted in the caption, defendants are variously known as Care One at Wall, LLC, doing business as Care One at Wall; Care One, LLC; DES Holding Co. Inc.; DES 2009 GST Trust; and DES-C 2009 GRAT. The complaint named other fictitious defendants that are not part of the appeal.

The estate contended that alleged substandard conduct at Care One caused decedent to experience "mucus plugs," which obstructed his airway and caused his death. Defendants, meanwhile, contended they adhered to professional standards of care, and that Boehm had passed away from a heart attack caused by underlying risk factors, including diabetes, hypertension, and the recent stroke.

After a trial that spanned three-weeks, the jury concluded defendants had deviated from the accepted standards of care applicable to long-term care facilities. However, the jury found the deviations were not the proximate cause of Boehm's death. The jury also found defendants' nursing staff did not deviate from the standard of care and that decedent's rights under the NHA were not violated.

The estate now appeals, raising various claims of trial error. For the reasons that follow, we affirm.

I.

Decedent's Admission to and Treatment at Care One

On November 15, 2015, Boehm, age sixty-nine, was admitted to the JFK Medical Center and diagnosed with an acute cerebral infarction or stroke, aspiration pneumonia with sepsis, and candidiasis of the upper respiratory tract.

After decedent experienced respiratory failure, he was intubated for respiratory support and diagnosed with aphasia and dysphagia. The following day, decedent underwent surgery and was provided with a tracheostomy tube and collar. Once his condition stabilized, decedent was transferred to the JFK Rehabilitation Institute, an acute rehabilitation facility, on December 3, 2015.

While at the acute rehabilitation facility, decedent was provided with occupational and physical therapies. He was discharged on January 13, 2016, needing "total care with all activities of daily living including bathing, dressing, bed mobility, transfers, and toileting." He was also receiving all nourishment through a gastrostomy tube and oxygen therapy through a tracheostomy tube.

Decedent's family decided he should be transferred to a subacute rehabilitation facility. Consequently, he was admitted to such a facility, Care One, on January 13, 2016.

At Care One, decedent still required total care for all activities of daily living, and he continued receiving all nourishment through the gastrostomy tube. On admission, a Licensed Practical Nurse ("LPN") assessed decedent. Decedent's admission orders required tracheostomy care every shift.

Decedent was provided at Care One with occupational, physical, and speech therapy. He was nonverbal at admission but could communicate through

gestures and some movements in his right arm. He was also noted to have a small pressure ulcer on his sacrum.

Decedent's medical records reflect he was not seen or examined by a physician during his two days at Care One. However, physician orders, relayed via telephone, specified that decedent receive inhalation treatments with acetylcysteine. There is no indication that a respiratory therapist administered this treatment; rather, it apparently was given by LPNs. Decedent's records also included an order for DuoNeb, a bronchodilator, as needed, although there is no documentation of that treatment being given to him.

On January 13, 2016, decedent's respiratory therapist at Care One noted that decedent had a weak cough and that the tracheostomy was suctioned twice with a "large amount of thick tan mucous expelled." The therapist testified at her deposition this was the only visit she had made to decedent.

The following morning, January 14, decedent was tachycardic with a pulse of 101 beats per minute, but there is no indication a physician was informed. Later, decedent was "coughing up thick yellowish grey sputum," but the record does not indicate he was provided with suctioning or that his attending physician was notified.

A-3901-22

Decedent's Passing on January 15, 2016

In the early morning of January 15, 2016, decedent again coughed up mucous and was suctioned "as needed."  At that time, his heart rate was still tachycardic and was elevated to 115 beats per minute.  In a progress note at 8:45 a.m., an LPN documented that decedent was "on [the] bed[,] [with his] eyes closed, face pale and sweaty . . . as [his] pulse was taken respiration ceased [and] heart rate ceased.  911 initiated, CPR in progress.  Medics on site."

The medical chart entry then noted:  "Res[ident] pronounced [dead] at 8:45AM.  Family [is] aware [and] will be in.  [The attending physician] [is] aware of res[ident's] death."

The Disputed Cause of Death

The parties and their respective experts disputed Boehm's cause of death.  Plaintiff presented expert testimony on causation from Jacob Dimant, M.D.  Dr. Dimant is a professor who teaches at New York University School of Medicine and serves as a physician at hospitals in Manhattan and Brooklyn.  He is licensed to practice medicine in New York, New Jersey, and two other states, and he is board certified in internal medicine, geriatric medicine, and rheumatology.

Dr. Dimant had worked at several LTCFs, such as the Metropolitan Jewish Geriatric Center, where he was a staff physician.  Dr. Dimant recounted that in

6

almost every facility in which he worked, he saw patients who suffered from respiratory, cardiac, tracheotomy, and ventilator issues. He also helped supervise the respiratory unit at a forty-bed subacute care unit, including staff such as nurses, respiratory therapists, and various specialists.

Dr. Dimant testified that decedent's cause of death was "respiratory failure related to what we call a mucus plug, which is obstruction of the airways by mucus." As Dr. Dimant explained, decedent's lungs could not get enough oxygen, which led to less oxygen in the blood, respiratory failure, and cardiac arrest. Dr. Dimant disagreed with the official cause of death noted on the death certificate, respiratory failure caused by pneumonia, because decedent's "pneumonia was stable immediately prior to his admission" to Care One and the medical records did not indicate the pneumonia was progressing.

Dr. Dimant concluded it was "more likely than not that Mr. Boehm's death was caused by mucus plugs that obstructed the airways. There was no documentation of symptoms that suggest other possibilities."

Defendants' competing causation expert, Stephen Akers, M.D., a critical care, internal medicine, and pulmonary medicine specialist, presented opposing opinions about the cause of decedent's injuries and death. Dr. Akers is a graduate of the University of Pennsylvania Medical School. He completed a

7

fellowship in pulmonary medicine and critical care medicine. He is board-certified in internal, pulmonary, critical-care, and sleep-disorders medicine. Dr. Akers has practiced medicine since 1982, and at time of trial was employed by Cooper Hospital in New Jersey and a medical group in California. For five years he was the medical director of a hospital intensive care unit. Dr. Akers has been an associate professor of medicine and has published articles in peer-reviewed medical journals.

Most pertinent in this case, Dr. Akers opined that the cause of Boehm's death could not have been a mucus plug. He noted that when Boehm's breathing and heart rate ceased, his medical team "hooked up the Ambu bag . . . to the tracheotomy, [and] they had no trouble ventilating him at all." Dr. Akers went on further to add that if Boehm "had a plug in the tracheotomy that was so severe and so total that it caused him to stop breathing, asphyxiate, and die a sudden death, they would never [have] been able to ventilate him with [the Ambu] bag" as they had. Instead, Dr. Akers believed decedent suffered a fatal heart attack due to certain risk factors, including diabetes, a recent stroke that affected his blood vessels, and hypertension. Dr. Akers further noted that when a nurse checked on decedent shortly before his death, he was found:

> . . . [to be] pale and sweaty and his eyes are closed. He's not responsive. He's basically unconscious.

A-3901-22

> Well that's exactly what you see in somebody who has a heart attack and suffers sudden death.
>
> They're fine one moment and then you get sweaty and pale. She checks his blood pressure. The blood pressure is 60 over 40. That's essentially blood pressure incompatible with life.
>
> So at that point he was, for all intents and purposes, deceased. Never demonstrated any respiratory distress at all.

Dr. Akers testified that his opinions were given within a reasonable degree of medical probability.

The DOH Investigation

In a letter to the DOH dated February 12, 2016, plaintiff Genevive Clifton, the estate's executor, made a formal complaint about the care provided to decedent while he was a resident at Care One. In the letter, plaintiff alleged her "father was killed by a lack of attention and capability."

The DOH responded to the executor in a letter dated August 18, 2016, advising that its "surveyor" had conducted an investigation on July 6, 2016, which included a tour of the facility, discussions with staff and residents, and a review of medical records and "other pertinent facility documents including staffing reports." The unnamed surveyor was "unable to identify" deficient

9

practices related to plaintiff's claims based on state and federal regulations. This letter is signed "Long Term Care Complaints Program."

The DOH separately advised Care One of its conclusions in a letter dated August 4, 2016. The letter recounted that no federal-law deficiencies were cited, based on the investigation, and that if any state-law deficiencies had been found, another form would have been enclosed. The letter was signed by Kimberly Strong, a Health Care Services Evaluator/Nurse with the DOH. Strong also signed a related document titled the Unannounced Visit/Revisit Report, but it is unclear whether she was the surveyor or part of a team of surveyors who investigated Care One on July 6, 2016.

Another expert for plaintiff, Lance Youles, a Licensed Nursing Home Administrator ("LNHA"), testified regarding the DOH investigation. On cross examination Youles testified that "there's discretion to how these surveyors do their surveys. And I can't assume that when they do a tour they go through every hallway. They may not. They may not go through every floor. I don't know."

Youles was asked multiple times on cross by defense counsel if he was "saying that the State of New Jersey did not do an appropriate survey." He was also asked if he was "not willing to accept what's written on this letter from the State of New Jersey Department of Health" that there were no deficiencies

found. Youles responded there was not enough information detailing what investigators and surveyors actually did on the Care One premises, what they may have reviewed or whom they may have spoken with. Hence, Youles could agree only that counsel had read the DOH letter aloud accurately; he could not agree or disagree with the letter's conclusions nor the information it contained.

Expert Testimony on the Standards of Care

Plaintiff presented expert testimony addressing the standards of care from Nurse Barbara Darlington and Dr. Diamont.

Darlington became a registered nurse ("RN") in 1965 after completing a diploma program, and she received a bachelor's degree in nursing in 1985 and a master's degree in 2000. She began her career as a staffing nurse and then worked in a hospital's intensive-care and coronary-care units.

Thereafter Darlington worked for nursing homes as a nurse, a nursing director, and finally as an LNHA. She eventually became a vice president of professional services, overseeing quality assurance in multiple nursing homes and setting policies and procedures. She retired in 2020 but continued to teach an LNHA course and perform consulting.

A-3901-22

Darlington is not a respiratory therapist. However, she had supervised respiratory therapists in her role as an administrator and had performed suctioning and chest therapy "many times."

In her expert report for the estate, Darlington opined that certain interventions that would be consistent with the standard of care for patients with tracheostomies—such as assessments for impaired gag reflex and cardiopulmonary status—were not included in decedent's interim care plan. Darlington further noted that other interventions pertaining to suctioning and documentation of that procedure were absent from the care plan, although they should have been included in accordance with Care One's Policies and Procedures.

Among other things, Darlington in her report cited the Standards of Nursing Practice created by the American Nurses Association in 1991. That publication details standards for nursing assessments, diagnoses, outcome identification, planning, implementation, and evaluation. Darlington concluded in her report that the staff at Care One failed to adhere to these professional standards of nursing care, particularly in planning and implementation.

Darlington further opined that Care One failed to adhere to "federal regulation F656. 483.21(b), Comprehensive Care Plans," which requires a

12

facility to "develop and implement a comprehensive person-centered care plan." She added that Care One violated its own policies and procedures, which require the creation of a "comprehensive care plan" that is "designed to reflect currently recognized standards of practice for problem areas and conditions."

As another deficiency, Darlington observed the progress notes in decedent's medical records all were authored by LPNs, even though LPNs are not permitted to assess patients under their licensure and scope of practice. According to Darlington, assessments can only be done by RNs, but nothing in the medical records showed that an RN had assessed decedent while he was at Care One. Darlington asserted this omission violated F282, 42 C.F.R. § 483.21(b)(3), which requires care to be provided by "qualified persons."

Additionally, Darlington found that Care One violated F328, 42 C.F.R. § 483.25(i) because its nursing staff failed to provide care "consistent with professional standards of practice, the comprehensive person-centered care plan, and the resident's goals and preferences."

Darlington maintained that decedent "required complex medical management and assessment," yet no attending had physician examined him while he was at Care One. She found that Care One's failure to notify decedent's

attending physician of significant changes in decedent's conditions also violated federal regulations under F580, 42 C.F.R. § 483.10(g)(14).

As a result, Darlington concluded decedent had experienced respiratory distress, respiratory failure, and death on January 15, 2016. She noted the cause of death was documented on the death certificate as "respiratory failure due to pneumonia." With respect to that cause, Darlington opined that Care One "contributed to the death of Mr. Boehm, owing to the multiple failures on the part of [the facility's] nursing staff."

In his own expert report, Dr. Dimant opined that "the staff at Care One failed to provide Mr. Boehm with evaluations, care and treatment by qualified personnel to meet his medical needs." He asserted that Care One and its staff did not prepare an appropriate interim care plan when decedent was admitted, "as required by NJ regulations." He noted the care plan "was reviewed by RNs only after Mr. Boehm's death."

Dr. Dimant also criticized Care One's failure to provide evaluations by appropriately qualified health care providers because LPNs, who assessed and provided treatment to decedent, "are not trained or qualified [or] authorized to provide independent assessment or care planning." He noted that New Jersey

14

regulations "required that RNs shall assess the nursing needs of each resident and cannot delegate" such duties to LPNs.

To "a reasonable amount of medical certainty," Dr. Dimant concluded that Care One's failures to provide evaluations, assessments, and adequate treatment "were the direct cause of Mr. Boehm's death on 1/15/16 due to respiratory failure resulting from mucus plugging."

In addition to calling Dr. Akers as an expert on causation issues, defendants presented Julie Hester, RN as an expert on standards of care for nurses at a long-term care facility. Nurse Hester is both a licensed nurse and a nursing home administrator. She has a master's degree from Carnegie Mellon University in public policy and management and health systems, and a certification from Duquesne University in forensic nursing. She has substantial experience administering respiratory treatments, including for patients who have had tracheotomies. She has trained nurses on the proper techniques in tracheotomy care and suctioning.

Based on her own review of the record, Nurse Hester opined that the Care One nursing staff complied with the standards of care in their treatment of decedent. Among other things, Hester noted that the facility's staffing levels were appropriate, the admitting orders for decedent were appropriately signed

15

off by an RN and an LPN, and a care plan did not have to be written in decedent's chart for up to twenty-one days after admission. Notably, Nurse Hester countered the opinions of Nurse Darlington by testifying that the standards of care in 2016 permitted an LPN to assess patients, evaluate patients' respiratory status, give acetylcysteine medication treatments to patients, suction a tracheotomy, and provide respiratory care when supervised by an RN, as they were here.

Hester further opined that Care One's treatment of decedent complied with the rules, regulations, and statutes that governed a LTCF in 2016. She presented her opinions "within a reasonable degree of probability or more likely than not."

Pretrial Rulings

Prior to trial, plaintiff moved in limine to bar testimony regarding the DOH investigation and its conclusions, which the court granted in part and denied in part. The court ordered that defendants' experts "are limited to exclude any testimony regarding conclusions reached by the [DOH] and Kimberly Strong in their July 7, 2016 Survey and the August 18, 2016 Letter to [the executor]." However, apart from this restriction on the defense experts, defendants were not prohibited from otherwise eliciting testimony regarding the DOH's conclusions.

16

Defendants moved in limine to bar reference to alleged violations of federal and New Jersey statutes and regulations. The court denied the blanket prohibition sought by the motion, but its order allowed experts to cite those codified provisions only "if they relied on those standards as evidence of negligence but not negligence per se."

Defendants further moved in limine to bar experts from testifying and opining beyond the scope of their expertise. The court denied this motion, specifically allowing Dr. Dimant, a physician, to testify about nursing home standards of care and the care and treatment of decedent.

The Trial and the Jury's Verdict

After a lengthy trial,[2] seven of the eight jurors found that Care One had "deviated from the accepted standard of care applicable to a long-term care facility." Critically, however, the jury unanimously found the deviation was not a proximate cause of decedent's damages and death.

Seven jurors also found that Care One's nursing staff had not deviated from the accepted nursing standard of care and that Care One had not violated decedent's rights under the NHA.

---

[2] The trial was presided over by a different judge than the one who had made the pretrial rulings.

A-3901-22

Consequently, plaintiff was awarded no damages. Plaintiff moved for a new trial, which the trial judge denied in a detailed written opinion.

This appeal ensued.

II.

Plaintiff presents the following arguments for our consideration: (1) the court erred by allowing defendants to use the DOH's investigation during cross-examination; (2) the court improperly limited plaintiff's expert testimony; (3) the court permitted numerous "speaking objections" by defense counsel and unduly lengthy sidebars; (4) the jury's verdict that Care One deviated from the standard of care was inconsistent with its verdict that decedent's rights under the NHA were not violated; (5) the court erred by instructing the jury that plaintiff needed to establish proximate cause in order to be awarded damages for the violation of rights under the NHA; and (6) the court erred in denying plaintiff a new trial.

We examine these issues in the discussion that follows. In doing so, we are guided by well-established standards.

18

With respect to plaintiff's first two arguments[3] claiming the trial court misapplied principles of evidence, we bear in mind that "an appellate court reviews a trial court's evidentiary rulings, like those at issue here, with substantial deference and will not overturn such a ruling unless it constituted a clear abuse of discretion." Hrymoc v. Ethicon, Inc., 254 N.J. 446, 463 (2023); see also Green v. N.J. Mfrs. Ins., 160 N.J. 480, 492 (1999).

In that same vein, the "admission or exclusion of expert testimony is committed to the sound discretion of the trial court." Townsend v. Pierre, 221 N.J. 36, 52 (2015). Therefore, the trial court's ruling about expert admissibility should be reversed "only if it 'was so wide off the mark that a manifest denial of justice resulted.'" Rodriguez v. Wal-Mart Stores, Inc., 237 N.J. 36, 57 (2019) (quoting Griffin v. City of E. Orange, 225 N.J. 400, 413 (2016)).

## A.

Plaintiff's first and central argument concerns defendants' use of the hearsay reports of the DOH in cross-examining plaintiff's witnesses. In essence, plaintiff argues defense counsel improperly engaged in what may be termed "phantom impeachment" through confronting her witnesses with the hearsay

---

[3] We discuss, infra, the discrete standards of review respectively associated with each of plaintiff's remaining issues.

opinions of DOH inspectors who did not testify themselves and whose reports were not in evidence.

The pertinent background on this issue is as follows.[4]  After the pretrial judge issued the order on August 1, 2022 barring defendants' experts from testifying about the DOH's conclusions, defendants issued via email on August 6, 2022, a trial subpoena on Kimberly Strong, instructing her to appear as a witness for trial.  The subpoena also demanded that Strong bring with her various documents, including the July 6, 2016 Unannounced Visit/Revisit Report and other documents generated through the DOH investigation.  The subpoena was also personally served on Strong at her residence.

On December 19, 2022, the Deputy Director of the Office of Legal and Regulatory Compliance at the DOH responded to the subpoena, advising defense counsel that Strong is a federal employee and that federal regulations require defendants to serve a written request for Strong's testimony on the federal agency that administers the survey program.  Defense counsel wrote the federal agency on March 21, 2023, seeking to obtain the agency's authorization to have her appear as a witness at the upcoming trial.  Meanwhile, the Deputy Director

---

[4]  Some of the information in this discussion of the case's procedural history was drawn from documents that defense counsel helpfully supplied us at our request, without objection by plaintiff, following the oral argument.

wrote defense counsel that same day and advised that Strong would be unable to testify without the federal agency's authorization. Defense counsel responded on March 23, advising that he would need to apply to the trial court to enforce the subpoena, noting that "without that testimony [from Strong] I am unable to show that no deficiencies [at Care One] were found." Following these exchanges, a Deputy Attorney General filed a motion on March 23, 2023, to quash the subpoena. The motion was made returnable on April 14, 2023, a civil motion day.

Meanwhile, the jury trial had already commenced on March 16, 2023, and several witnesses had testified. The presentation of evidence ended on March 30, 2023, and closing arguments were presented on April 3, 2023. The jury returned its verdict on April 4, 2023. The following day, April 5, the Deputy Attorney General withdrew the motion to quash as moot. Apparently, the federal agency never granted authorization for Strong to testify.

In light of the circumstances, defendants attempted to divulge to the jury the DOH's conclusions through the cross-examination of plaintiff's witnesses. The prohibition in the pretrial order, as noted above, only restricted references to the DOH investigation in the testimony of defendants' experts and did not

21

restrict defense counsel in referring to the DOH investigation in questioning plaintiff's witnesses.

In particular, after plaintiff's expert Youles testified he was familiar with the regulatory compliance process and opined that Care One had violated federal and state regulations, the court allowed defense counsel to question him on cross examination regarding the DOH's investigation of decedent's care and its contrary conclusion that no regulations were violated. The defense maintained that the revelation of the DOH's findings was appropriate to impeach the credibility of Youles and plaintiff's other witnesses. Although the documents containing the DOH's findings were not moved into evidence as a physical exhibit, the jury learned through cross examination the substance of those findings, portions of which were read aloud to the jury.

Plaintiff argues the trial court erred in permitting this form of cross examination through the use of hearsay documents created by Strong and other declarants. Plaintiff contends that a proper foundation was never laid to authenticate and admit the DOH findings as a business record or a public record and that the references to that hearsay through cross examination was improper and prejudicial.

22

We agree with plaintiff that the court erred in allowing this method of "phantom impeachment," i.e., presenting to a witness on cross examination contrary hearsay statements made by a non-testifying declarant in a manner that divulges the substance of those statements and uses them for their truth. It is clear from the circumstances that defendants, having been stymied in their efforts to subpoena Strong to testify, elected this alternative route to get around her unavailability and have the contents of the DOH's conclusions divulged through cross examination. Defendants stressed the DOH's findings in their closing argument. Used in that manner for their truth, the findings were inadmissible hearsay. N.J.R.E. 801(c).

The DOH's written findings were not demonstrated to be admissible under the hearsay exceptions for business records or public records. The public records exception is limited to declarants with personal knowledge of the events described within the record or to the admission of "statistical findings," see N.J.R.E. 803(c)(8), whereas the DOH's conclusions of Care One's regulatory compliance went well beyond mere statistics and it is undetermined who the surveyor was. Moreover, the records were not shown with a proper foundation to meet the requirements of a business record admissible under N.J.R.E. 803(c)(6).

As we held in <u>Manata v. Pereira</u>, 436 N.J. Super. 330, 347 (App. Div. 2014), when hearsay evidence, such as a police report, is used to impeach a witness who did not author the report, it is generally inadmissible. A party may not, "under the guise of 'artful cross-examination,'" introduce the "substance of inadmissible evidence." <u>Id.</u> at 348 (quoting <u>United States v. Sanchez</u>, 176 F.3d 1214, 1222 (9th Cir. 1999)). Such "phantom impeachment" may warrant reversal, depending on the circumstances. <u>Id.</u> at 347.

That said, we do not reverse the judgment in this case because the "back-door" admission of the DOH's findings was manifestly harmless to plaintiff. Despite the divulged surveyor's conclusions of compliance, the jury nevertheless determined in its verdict that Care One did, in fact, deviate from standards of care in their care and treatment of decedent. However, the finding of deviation was inconsequential because the jurors also found that the deviation was not the proximate cause of the patient's death and injuries. The DOH findings did not address causation.

Reading between the lines, it can be inferred that the jury was persuaded by defendants' theory, backed by the expert testimony of Dr. Akers, that decedent had passed away from a heart attack caused by underlying health conditions, and not from, as plaintiff advocated, an inadequately treated mucus

24

plug.  The jury could reasonably have found that although Boehm's respiratory care was insufficient, it did not cause his death or fatal injuries.

In short, the error in allowing the improper cross examination was not "clearly capable" of producing an unjust result.  R. 2:10-2.  The no-cause verdict hinged on a failure to prove causation, not deviation.

## B.

Plaintiff's second evidentiary argument for reversal is likewise unavailing. As we noted above, the pretrial judge did restrict expert witnesses from testifying outside of their established areas of expertise.  And, as we also have noted, plaintiffs did not present expert testimony from a respiratory therapist. Nonetheless, as the trial unfolded, both Nurse Darlington and Dr. Dimant— neither of whom is a respiratory therapist—gave extensive testimony criticizing decedent's respiratory care at the LTCF.  As the trial judge noted in her thoughtful post-trial opinion, both expert witnesses were allowed "to testify about the nursing home standard of care, which included respiratory care." (Emphasis added).  The court acknowledged that neither expert was permitted to "testify specifically concerning the standard of care applicable to an individual respiratory therapist."  (Emphasis added).  We discern no abuse of discretion in the court's handling of these evidentiary issues.  Moreover, no

A-3901-22

harmful error has been demonstrated, given the jury's pivotal verdict on causation.

## C.

Plaintiff next contends it was unduly prejudiced at trial because the court permitted defense counsel to make numerous "speaking objections" and "lengthy sidebars." We discern no merit to this argument. R. 2:11-3(e)(1)(E). Suffice it say that a trial judge has "wide discretion in controlling the courtroom and the court proceedings." D.G. ex rel. J.G. v. N. Plainfield Bd. of Educ., 400 N.J. Super. 1, 26 (App. Div. 2008) (citing Ryslik v. Krass, 279 N.J. Super. 293, 297 (App. Div. 1995)); see also N.J.R.E. 611. We detect no abuse of that discretion here that would justify setting aside the verdict from this long, mutually hard-fought trial.

## D.

We combine our discussion of plaintiff's fourth and fifth listed issues, both of which concern the application of the NHA. In Point IV, plaintiff contends the jury's determination on the malpractice count that Care One deviated from professional standards of care is inconsistent with its verdict on the final count that plaintiff's rights under the NHA were not violated. In Point V, plaintiff argues the court erred in instructing the jury that plaintiff needed to establish

A-3901-22

proximate cause to recover damages under the NHA. To the extent these arguments entail questions of law, we review those legal issues de novo. Manalapan Realty, L.P. v. Twp. Comm. of Twp. of Manalapan, 140 N.J. 366, 378 (1995).

In enacting the NHA in 1976, the Legislature sought to protect residents of nursing homes from "inferior treatment." S. Insts., Health & Welfare Comm. Statement to S. 944, at 1 (June 4, 1976). One right the Legislature included was the right "to a safe and decent living environment." N.J.S.A. 30:13-5(j). The term "safe and decent living environment," which plaintiff invoked in this case, is not defined within the statute.

To enforce these rights, the NHA expressly provides a cause of action for any resident whose rights as enumerated in the NHA are violated. The statute allows for injunctive relief and recovery of "actual or punitive damages for their violation." N.J.S.A. 30:13-8.

The NHA applies only to nursing homes, which it defines as

> any institution, whether operated for profit or not, which maintains and operates facilities for extended medical and nursing treatment or care for two or more nonrelated individuals with acute or chronic illness or injury, or a physical disability, or who are convalescing, or who are in need of assistance in bathing, dressing, or some other type of supervision,

27

and are in need of such treatment or care on a continuing basis.

[N.J.S.A. 30:13-2(c).]

This particular Care One facility meets that definition. We take judicial notice that this Care One is licensed by the DOH as a "long-term care facility."[5] It is certified by the federal government as a "skilled nursing facility,"[6] which federal regulations define as a facility "primarily engaged in providing to residents (A) skilled nursing care and related services for residents who require medical or nursing care, or (B) rehabilitation services for the rehabilitation of injured, disabled, or sick persons . . . ." 42 U.S.C. § 1395i-3(a). These characteristics fall within the scope of the NHA's definition of a nursing home facility. Whether decedent was admitted to Care One for long-term care or short-term care is inconsequential; the NHA specifically covers residents who are convalescing.

---

[5] N.J. Dep't of Health, Detailed Information on [Care One] at Wall, https://healthapps.nj.gov/facilities/fsFacilityDetails.aspx?item=NJ556213 (last visited June 12, 2025).

[6] Ctrs. for Medicare & Medicaid Servs., Skilled Nursing Facility Quality Reporting Program—Provider Data, https://data.cms.gov/provider-data/dataset/fykj-qjee (Nov. 1, 2024).

As we noted above, seven of the eight jurors found that plaintiff had not sustained the burden of proving that Care One had violated decedent's "rights under the [NHA], specifically [his] right to a safe and decent living environment and considerate and respectful care that recognizes his dignity and individuality." Plaintiff contends that finding of an unproven NHA violation cannot be reconciled with the jury's verdict on count one that Care One "deviated from the accepted standard of care applicable to [an LTCF]."

The verdicts on these counts are not necessarily inconsistent. The statutory right to a "safe and decent living environment" and "considerate and respectful care that recognizes [the resident's] dignity and individuality" is not synonymous with the common-law right to recover damages for proven malpractice.

Indeed, plaintiffs surely would not want statutory liability under the NHA to depend on proving malpractice liability. That is undoubtedly why plaintiff included a statutory count in the complaint along with the common-law claims. One can readily envision situations in which the medical care at a nursing home comported with medical standards of care for diagnosis, medication, and so forth, but the facility treated the residents in a disrespectful manner in violation of the NHA. To be sure, evidence of malpractice often could also establish a

29

facility's callous disregard for a resident's dignity and individuality, but the nomenclature and concepts are not identical. Hence, the jury's finding on count one was not dispositive of the verdict on the NHA count.

It is plausible that the jury believed that although the facility itself acted negligently, the staff nevertheless provided the appropriate care to decedent sufficient to create a "safe and decent living environment." Given Dr. Akers's expert opinion "within a reasonable degree of medical probability" that decedent did not die of a mucus plug, it is also plausible that the jury believed his death was not caused by a lack of care or violation of his rights. Because there exists a "ready, logical, or practical manner" in which the jury could find that Care One deviated from the standard of care, but decedent's rights were not violated, the jury's verdict is not inconsistent. JMB Enters. v. Atl. Emps. Ins. Co., 228 N.J. Super. 610, 616 (App. Div. 1988).

There is also a legal reason why plaintiff's inconsistency argument does not succeed. Our case law has long permitted "inconsistent verdicts to be returned by a jury because it is beyond [their] power to prevent them." State v. Banko, 182 N.J. 44, 54 (2004) (citing State v. Ragland, 105 N.J. 189, 204-05 (1986)). Inconsistent verdicts are not nullified so long as the "record was sufficient to support" each verdict. State v. Muhammad, 182 N.J. 551, 578

(2005) (citing <u>Banko</u>, 182 N.J. at 54-55).  We are satisfied the trial record sufficiently and independently supports the verdicts in question.

Plaintiff's separate argument concerning proximate causation on the NHA claim is also unavailing.  We briefly discuss this argument, even though it was not raised before the trial court in plaintiff's new trial motion.

As mentioned above, the NHA authorizes "actual or punitive damages for [its] violation."  N.J.S.A. 30:13-8.  The term "actual" conveys a requirement of harm that is real and not speculative.  Punitive damages are not recoverable under the Punitive Damages Act, N.J.S.A. 2A:15-5.13(b), unless actual compensatory damages are proven.  The NHA does not specify that nominal or presumed damages are available remedies.

Here, the jury found on question two of the verdict form that plaintiff had not proven that Care One's alleged deviations were a proximate cause of Boehm's "damages and death."  This finding of no-causation logically permeates the entire verdict.  Again, the finding is supported by Dr. Akers's expert opinion attributing decedent's demise to underlying poor health and the aftermath of a stroke.

Moreover, there are no damages to recover under the NHA unless a plaintiff proves by a preponderance of the evidence a violation of the statute.  In

31

question six of the verdict form, the jury found no such violation here and, as appropriately instructed, ceased its deliberations.

E.

We finish our discussion by rejecting the argument that the court erred, post-verdict, in denying plaintiff's motion for a new trial. Plaintiff essentially contends that a new trial is necessary because of the combination of alleged errors we have already discussed. Where such cumulative error is raised in the context of a motion for a new trial, "an appellate court looks to the 'miscarriage of justice' standard in reviewing a trial court's denial" of the motion. Pellicer v. St. Barnabas Hosp., 200 N.J. 22, 52 (2009) (citing R. 2:10-1).

For the reasons we have already stated, we detect no error, much less cumulative error, that would have required the court to grant plaintiff's new trial motion. The sole error we have identified concerning "phantom impeachment" is rendered harmless by the jury's finding of a lack of proximate causation. We will not speculate that the defense's inappropriate method of impeachment on standards of care somehow infected the jury's analysis of the discrete causation issue.

A-3901-22

F.

In sum, although decedent's passing was surely tragic, there is no legal reason to set aside the verdict in favor of defendants. To the extent we have not addressing any issues, they lack sufficient merit to warrant discussion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

33                                                                    A-3901-22